PAULINE W. ACH, ET AL.,[1] PETITIONERS, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 94162–94164. Filed April 15, 1964.

*William R. Seaman* and *Ronald E. Heinlen,* for the petitioners.
*Gerald W. Fuller,* for the respondent.

---

[1] Proceedings of the following petitioners are consolidated herewith: Estate of Ernest M. Ach, Deceased, Pauline W. Ach, Sole Legatee and Pauline W. Ach, Surviving Wife, docket No. 94163; and The Ach Corporation, docket No. 94164.

118

120

122

OPINION

RAUM, *Judge:* 1. *Taxability of Vogues and Vanities Profits to Petitioner Pauline W. Ach.*—During the years 1954–58, profits in the amounts of $36,569.24, $40,663.64, $44,538.90, $41,777.51, and $45,297.28, respectively, were realized from Pauline's operation of the dress business known as Vogues and Vanities in Cincinnati, Ohio. These amounts were reflected in the returns for these years filed by the Ach Corp., but no taxes were paid thereon by reason of net operating loss carryovers from earlier years when Roger conducted a dairy business in Rising Sun, Ind., under the same corporation, then known by another name and with drastically limited charter powers that did not include the operation of a dress business. The Commissioner allocated the foregoing profits to Pauline under sections 482 and 61 of the 1954 Code. Subject to an adjustment, hereinafter noted, we think he was correct.

At the outset it is important that the factual background be clearly understood. For some 6 years Pauline's son Roger had owned all of the common stock in and was the principal officer of the Rising Sun Creamery Co. His father, Ernest, had bought the business for him in 1946, but its annual losses were heavy and it was kept alive only by a series of loans which Ernest made to the corporation. In late 1952 or early 1953 it was decided to give up that business, which in fact was terminated at some undisclosed time prior to August 1, 1953. Meanwhile, it was decided to make an entirely different use of the corporation. Pauline, as a sole proprietor, had been operating a successful dress business, known as Vogues and Vanities, in Cincinnati for 29 years. Its earnings were approximately $30,000 a year and rising. The name of Roger's corporation was changed to "The Ach Corporation," Pauline became its president, treasurer, and chairman of the board, and the assets of Vogues and Vanities were "sold" to the corporation for its non-interest-bearing note in the amount of $30,705.57, the net book value of such assets as of July 31, 1953. There was no "commitment" that Pauline continue to manage the enterprise, nor does there appear to have been any covenant not to compete. However, Pauline's management was essential to the success of the dress business, and it was obviously contemplated that she would continue to run it.

Plainly, this was not an arm's-length transaction. The corporation was hopelessly insolvent, and it is utterly beyond belief that any unrelated third party would have sold a prosperous business for a non-interest-bearing $30,705.57 note of such an insolvent maker where the level of earnings of that business was about $30,000 a year and rising, and where the seller contemplated continued full-time management of the business without compensation. Notwithstanding testimony indicating otherwise, it is all too clear to us on this record that Pauline was acquiring control of this moribund corporation for the purpose of attempting to utilize the net operating loss carryover of the dairy business, to offset the resulting deductions against earnings of her successful dress business, and to obtain the actual benefits of those tax-free earnings by having the corporation pay off, first, her $30,705.57 note, and then the notes of some $280,000 held by her husband which were otherwise uncollectable—all of which would be received free of tax!

It has been suggested by the Government that we look through the corporate fiction and tax the earnings of Vogues and Vanities directly to Pauline as though she had never transferred any part of that business to the corporation. However, we think that this would not be proper. The corporation was actually in existence, and there was a genuine transfer of assets to it that were actually used in the conduct of the dress business. It had salaried employees and discharged its

obligations to the State and Federal Governments in respect of workmen's compensation, social security, and the like. While there are situations in which the corporate fiction may be ignored, cf. *Haberman Farms, Inc.* v. *United States*, 305 F. 2d 787 (C.A. 8), we think that this is not one of them. Nevertheless, it does not follow that all of the income from Vogues and Vanities is properly to be charged to the corporation rather than to Pauline. And this brings us to section 482, upon which the Commissioner strongly relies. It provides that:

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

In our judgment these provisions justify an allocation here.

Petitioners earnestly contend that section 482 is inapplicable because "two or more" organizations, etc., are not involved in this case. We hold otherwise. The statutory provisions are broad and sweeping. They refer to "two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated)." Pauline certainly conducted Vogues and Vanities as an individual prior to August 1, 1953, and, as such, she was a taxpayer of the character referred to in section 482. Similarly, the corporation is a separate taxpayer covered by this statute. And Pauline did not cease to be a separate taxpayer or "organization," "trade," or "business," within the purview of these provisions by reason of her "sale" of the naked assets of the dress business to the corporation. The balance sheet of Vogues and Vanities, as of July 31, 1953, is set forth in our findings, and it shows precisely what Pauline "sold" to the corporation.

The assets appearing on the balance sheet consist of (1) "current" assets (primarily accounts receivable, a comparatively small amount of inventory, and several other items), (2) "fixed" assets (furniture, fixtures, and leasehold improvements, having a total depreciated cost of $2,568.11), and (3) "deferred charges" (unexpired insurance in the amount of $161.43). No intangible assets appear on the balance sheet, and we cannot find that Pauline in fact transferred any intangible assets to the corporation. Moreover, what was probably the most important aspect of the business, Pauline's active participation as manager and guiding spirit, was not transferred to it. Cf. *Frederic R. Harris, Inc.*, 40 T.C. 744, 750. The corporation did not receive the

right to Pauline's services; there was no contract of employment between them; and she in fact rendered her services to the corporation voluntarily without compensation. Nor did the corporation receive a covenant not to compete from Pauline. For aught that appears, in the absence of a covenant not to compete, she could readily have established a competing business that might well have rendered Vogues and Vanities worthless, apart from the balance sheet assets "sold" to the corporation. Indeed, in view of the balance sheet, it is not clear that there was even a transfer of the right to use the name Vogues and Vanities. In any event, sufficient aspects of the business remained with Pauline so as not to deprive her of the status of a separate "organization," "trade," or "business," within the meaning of section 482.

Section 482 is remedial in character. It is couched in broad, comprehensive terms, and we should be slow to give it a narrow, inhospitable reading that fails to achieve the end that the legislature plainly had in view. We think that the statute is not made inapplicable by its reference to "two or more organizations, trades, or businesses."

Another ground for the alleged inapplicability of section 482 is petitioners' contention that Pauline was not in "control" of the corporation during the tax years, since she did not become a stockholder of record until 1959. Section 482 speaks of two or more organizations, etc., "owned or controlled directly or indirectly by the same interests." Here, again, the language is broad and sweeping, and is ample to cover the present case.

Pauline was chairman of the board of directors and was the president and treasurer of the corporation. She was in full charge of its affairs. To be sure, the stock was formally owned by Roger and his brother, Laurence, but when Pauline wanted it in 1959 they transferred it all to her without consideration. The conclusion is irresistible that the corporation in fact belonged to her, and that she was actually the beneficial owner of the stock even prior to the formal transfer in 1959. In any event, it is not record ownership, but actual control, which counts in the application of the statute. *Grenada Industries, Inc.*, 17 T.C. 231, 254, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819. And it is difficult to imagine how anyone could have had more control over the corporation than was in fact exercised by Pauline.

Respondent may allocate income under section 482 in order to prevent "evasion of taxes or clearly to reflect the income." The legislative history of section 482 indicates that it was designed to prevent evasion of taxes by the arbitrary shifting of profits, the making of fictitious sales, and other such methods used to "milk" a taxable entity. *Ballentine Motor Co., Inc.*, 39 T.C. 348, affirmed 321 F. 2d 796 (C.A. 4); *Seminole Flavor Co.*, 4 T.C. 1215, 1228. The

Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious. See, e.g., *G.U.R. Co.* v. *Commissioner*, 117 F. 2d 187, 189 (C.A. 7); *National Securities Corp.*, 46 B.T.A. 562, 564, affirmed 137 F. 2d 600, 602 (C.A. 3), certiorari denied 320 U.S. 794; *Grenada Industries, Inc.*, 17 T.C. 231, 255, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819. In the instant case Pauline made the transfer of assets in order to defeat taxes; prior losses could be used to offset income from Vogues and Vanities, and this income, which would not be reduced by taxes, could then be distributed to her and her husband as payments on account of their notes. During the years in question, 1954–58, the corporation reported taxable income (before net operating loss deductions based on pre-1954 carryovers) in the amount of $194,145.23; this income was earned largely through Pauline's efforts. And during this period the corporation made payments in the amount of $192,015.57, $30,705.57 directly to Pauline and the remainder on account of her husband's notes. There was a distortion in income of the kind condemned by section 482, and an allocation by the Commissioner was fully warranted under section 482 in order "clearly to reflect the income" involved.

Nor is there basis for disapproving an allocation under section 482 because the Commissioner's allocation of "profits" of Vogues and Vanities was allegedly an allocation of "net income." The matter was recently considered in *Ballentine Motor Co.*, 39 T.C. 348, affirmed 321 F. 2d 796 (C.A. 4), which we regard as dispositive of this contention.

Although we approve an allocation under section 482 for the reasons set forth above, we do not approve the Commissioner's allocation of *all* of the profits of the Vogues and Vanities dress business to Pauline. The mere existence of common control is not itself sufficient to warrant the application of the statute; there must be in addition a distortion of income, and the Commissioner's power under the statute is limited to correct that distortion. *Grenada Industries, Inc.*, 17 T.C. at 254, 255.

To be sure, there was substantial distortion of income in this case, as shown above; but *some* of the income from the dress business was properly attributable to the corporation, and should not have been allocated to Pauline. The corporation did own assets that were used in the business, and it had paid employees who performed services. Some portion of the profits of Vogues and Vanities was attributable to these factors. However, the most important factor in the earning process was Pauline's management. Although there

were 9 to 12 employees, their total compensation, according to the returns in evidence, ranged from $15,609.67 in 1954 to $20,012.90 in 1958. Plainly, their contribution to the enterprise was largely of a routine nature. And while capital was a factor, the rapid turnover of inventory, at least several times a year, as is indicated in the returns, makes this a matter of lesser importance. Using our best judgment on the entire record, we have concluded and hereby find as a fact that 70 percent of the profit of Vogues and Vanities was attributable to Pauline's services, cf. *Cohan* v. *Commissioner*, 39 F. 2d 540, 544 (C.A. 2), and was properly allocated to her.[2] We hold that the Commissioner erred in allocating the remaining 30 percent to her.

2. *Carryover of the Corporation's Net Operating Losses From the Dairy Business.*—The Commissioner determined that the corporation could not carry forward the net operating losses incurred in a period prior to August 1, 1953, in operating a creamery and dairy business in Rising Sun, Ind., and apply them against income earned in a period subsequent to August 1, 1953, from the operations of Vogues and Vanities, a dress and apparel shop, located in Cincinnati, Ohio, because of the application of section 129 of the Internal Revenue Code of 1939, and section 269, the corresponding provision in the Internal Revenue Code of 1954 and, alternatively, because of what is sometimes referred to as the doctrine of *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382.

Section 269 provides in part as follows:

(a) IN GENERAL.—If—

(1) any person or persons acquire, or acquired * * * control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation.[3]

The first issue thus presented is whether Pauline's "principal purpose" upon transferring the Vogues and Vanities' assets was to acquire "control" of the corporation in order to avoid taxes by obtaining the benefit of its net operating losses as a deduction against income

---

[2] This determination automatically disposes of petitioner's contention that the deficiencies for 1954 and 1955 are barred by limitations. Sec. 6501(e)(1) provides for a 6-year period of limitations where there is an omission in excess of 25 percent of the gross income stated in the return. As a result of the foregoing conclusion, the 25-percent requirement has been met here, and there is no dispute that this proceeding is timely if that requirement is satisfied.

[3] The language in sec. 129(a) of the Internal Revenue Code of 1939 is substantially identical to the language in sec. 269(a).

of Vogues and Vanities. The fact that the deduction is claimed by the acquired corporation is no bar to the application of this section. *Thomas E. Snyder Sons Co.*, 34 T.C. 400, 406, affirmed 288 F. 2d 36 (C.A. 7); *Frank Spingolo Warehouse Co.*, 37 T.C. 1, 5; *Mill Ridge Coal Co.* v. *Patterson*, 264 F. 2d 713, 716, 717 (C.A. 5), certiorari denied 361 U.S. 816. The corporation contends that Pauline did not acquire control over it because section 269(a) defines control to be the acquisition of 50 percent of the total voting stock or 50 percent of the total value of shares of all classes of stock and Pauline owned no stock prior to 1959. We disagree. Although Pauline did not have record ownership of the shares of stock, we are satisfied on this record that she was the beneficial owner and hence was the owner of the stock within section 269. Pauline had transferred assets of a prosperous business to a hopelessly insolvent corporation, she became its president, treasurer, and chairman of the board. When these circumstances are viewed together with her sons' transfer of their shares to her without consideration at her request in 1959, we are convinced that she was the true beneficial owner of the stock from the time that she took charge of its operations. We heard proffered explanations for the delayed transfer of the shares to Pauline but did not find them credible. She was in reality the owner of 100 percent of the stock and exercised control over the corporation commensurate with that of a sole shareholder. To construe "control" in section 269 to mean record ownership would be to provide a readymade tax-avoidance escape hatch for taxpayers in a provision which has as its purpose the prevention of tax avoidance. Such a construction is untenable.

Although there was some testimony by Pauline tending to indicate that there were business reasons for incorporating, the question is not whether there were reasons for incorporating her proprietorship, but rather whether her acquisition of control of *this* corporation had as its principal purpose tax avoidance. The oral testimony which suggested to the contrary is sharply contradicted by other facts of record. We do not find such testimony convincing and, to the extent that it attributed to Pauline a purpose other than tax avoidance in acquiring the corporation, we do not believe it. *Frank Spingolo Warehouse Co.*, supra at 6; *Thomas E. Snyder Sons Co.*, supra at 406. Our decision on this issue is similar to *Frank Spingolo Warehouse Co.*, supra; *Mill Ridge Coal Co.* v. *Patterson*, supra; *Thomas E. Snyder Sons Co.*, supra; and *J. G. Dudley Co.*, 36 T.C. 1122, affirmed 298 F. 2d 750 (C.A. 4).

In view of our conclusion reached above, we do not find it necessary to decide whether the so-called doctrine of *Libson Shops, Inc.* v. *Koehler*, 353 U.S. 382, is also fatal to the corporation's contention. There is, however, strong support for respondent's position in such

decisions as: *J. G. Dudley Co., supra; Norden-Ketay Corporation* v. *Commissioner*, 319 F. 2d 902 (C.A. 2), affirming a Memorandum Opinion of this Court; *Commissioner* v. *Virginia Metal Products, Inc.*, 290 F. 2d 675 (C.A. 3), reversing 33 T.C. 788, certiorari denied 368 U.S. 889; *Julius Garfinckel & Co.*, 40 T.C. 870; *Huyler's*, 38 T.C. 773; *Arthur T. Beckett*, 41 T.C. 386; *Frederick Steel Co.*, 42 T.C. 13.

*Decisions will be entered under Rule 50.*