**DORBA HOMES, INC., et al., Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

Nos. 57–63, Dockets 32049–32055.

United States Court of Appeals
Second Circuit.

Argued Sept. 10, 1968.

Decided Nov. 6, 1968.

H. Stewart Dunn, Jr., Washington, D. C. (William C. Gifford, Jr., Washington, D. C., and Percival D. Oviatt, Jr., Woods, Oviatt, Gilman, Sturman & Clarke, Rochester, N. Y., on the brief), for petitioners.

Issie L. Jenkins, Dept. of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, and Elmer J. Kelsey, Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

'Since 1946, Ellery J. Caldwell and Gerald E. Cook have engaged in various aspects of the residential construction business in the vicinity of Rochester, New York. Until September 30, 1952, they operated entirely as a partnership, under the name of Caldwell & Cook, in which the two were equal partners. At that time, they formed Caldwell & Cook, Inc. (the Corporation) which assumed most of the operations of the partnership. Until 1954 the partnership remained inactive except for a small insurance business.

In July 1953, the Corporation experienced major labor difficulties when the local Allied Trades Council, in an unsuccessful attempt to pressure the Corporation into accepting a union contract, made it extremely difficult for it to obtain supplies and utilities for new homes. To prevent the recurrence of such a labor squeeze, Caldwell and Cook decided to divide the operations of the Corporation into an "owning company," a "construction company," and a "labor supply company." The "labor supply company" was expected to contract for its workmen's services with the construction companies. But if the "construction companies" encountered labor problems, it was hoped that the "owning company" could then contract with unrelated builders to have the work completed. Also, Cook and Caldwell, to minimize the possibility of future irreconcilable disagreements between themselves decided that each should have his own construction company. Accordingly, in June 1954, Cook formed the Sierra Construction Co., Inc. (Sierra) as his construction company; Caldwell formed Woodcroft Construction Co., Inc. (Woodcroft) as his; and they jointly organized Monroe Builders' Service Co., Inc. (Monroe) to employ the former workmen of the Corporation and to contract for the workmen's services with Sierra and Woodcroft. The Corporation became the "owning company," taking title to building lots and engaging in land development and sales promotion.

In August 1955, Caldwell organized petitioner Velmar Homes, Inc. (Velmar) purportedly to have an "owning company" under his sole control. Nine months later, in May 1956, Cook continued the separation of interests by forming peti-

tioner Dorba Homes, Inc. (Dorba) as his personal "owning company." Velmar and Dorba bought lots, contracted primarily with affiliated construction companies for the building of homes, and sold the finished houses, usually at a profit.

Also in August 1955, petitioner Dewmar Construction Co., Inc. (Dewmar) was organized. Dewmar engaged in the construction of homes on sites owned by Velmar, Dorba, or by itself. Cook's wife, Dorothy, owned 80% of the outstanding shares of Dewmar and Cook himself owned the rest. The ostensible purpose for creating Dewmar was to protect Mrs. Cook against the untimely death of her husband by providing her with an estate of her own. Four years later, in July 1959, petitioner Lumar Homes, Inc. (Lumar) was formed as a construction company for Caldwell's wife, Lulu. The pattern of stock ownership, the alleged purpose and the activities of Lumar mirrored those of Dewmar.

In 1960, Caldwell and Cook decided to enter the business of building and selling homes on property located near Pittsford, New York, which was about 15 miles from the site of their earlier operations in Greece, New York. They estimated that the average cost of a completed home in Pittsford would be $7,000 more than in Greece and considered the project somewhat more venturesome. Allegedly in order to protect the assets of the existing corporations from the increased risks, Caldwell formed petitioner Powder Mill Homes, Inc. (Powder Mill) at his whollyowned company for Pittsford operations, and Cook organized petitioner Mendon Homes, Inc. (Mendon) for the same purpose.

From 1954 until 1956 or 1957, the Corporation was in charge of land development activities, and administrative and selling functions. At the end of that period the partnership assumed those responsibilities, and the function of the Corporation was limited to buying lots and contracting for the construction of houses thereon. Finally, in 1961, Cook

and Caldwell together organized petitioner Landorama, Inc. to take over the land development activities of the partnership for the avowed purpose of limiting their personal liability with respect thereto.

Throughout the period, the formalities of each corporate entity were observed. The partnership (after 1960, Landorama, Inc.) developed land for sale to the "owning" corporations which in turn engaged the "construction" companies to erect houses. Monroe then contracted to supply skilled labor to the "construction" companies. In each transaction there was a charge based on cost plus a reasonable profit. For its part in selling the finished product, the partnership received the standard real estate commission. In addition, each corporation had its own books and records which were audited separately, and from which the auditors prepared separate financial statements. Each paid its own expenses from its separate bank account, entered into contracts in its own name, filed its own tax returns, delivered deeds in which it was named grantor and warranted the title of the property sold. The several corporations occasionally borrowed funds from each other.

The Commissioner determined that the taxable income reported by each corporation should be attributed to Caldwell & Cook, Inc. under §§ 61 and 482 of the Internal Revenue Code of 1954 (the Code); or, in the alternative, that the corporate surtax exemption for each corporation other than Caldwell & Cook, Inc. should be disallowed for the taxable years in dispute under § 269 of the Code.

The Tax Court held that the Commissioner's allocation of the entire taxable income of the corporations to Caldwell & Cook, Inc., under §§ 61 and 482, was arbitrary, unreasonable and unnecessary to prevent tax evasion or reflect income clearly. It also found that the corporations were not shams or mere paper entities, but active enterprises engaged in business. Furthermore, there was no evidence of actual shifting of income or deductions between Caldwell & Cook, Inc.

and the other corporations. From this determination, the Commissioner does not appeal.

On the other hand, the Tax Court held that the principal purpose for the formation of petitioners Velmar, Dorba, Dewmar, Lumar, Powder Mill, Mendon and Landorama, Inc. was tax avoidance through the use of additional surtax exemptions in violation of § 269.[1] From this judgment, the petitioners appeal. The Commissioner, however, does not challenge the Tax Court's decision that the acquisition of control of Woodcroft, Sierra and Monroe was for no such proscribed purpose.

On this appeal two issues emerge. First, does the record sustain the Tax Court's finding of illegal purpose; and, second, did the Tax Court improperly attribute the shares of Lumar and Dewmar held in the names of their wives, to Caldwell and Cook themselves.

It is well settled that the petitioners bear the burden of proving that the principal purpose for the several incorporations was not tax evasion, J. T. Slocomb Co. v. Commissioner of Internal Revenue, 334 F.2d 269 (2 Cir. 1964); indeed, the Commissioner's determination of purpose is presumptively correct. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). In this case, the essence of the Tax Court's decision is that petitioners have not carried that burden. If there is substantial support in the record for the Tax Court's determination, including inferences reasonably drawn from the evidence, this court must affirm, unless the Tax Court's finding is clearly erroneous. We conclude that the record in this case adequately supports the Tax Court's judgment with regard to the issue of principal purpose.

Although the Tax Court found that there was at least one valid business reason or explanation for each incorporation, it was not persuaded by Caldwell and Cook's testimony that a non-tax purpose was the principal one for the incorporation and operation of the petitioners on appeal. Dorba and Velmar, which were purportedly formed in order to allow each man to have his personal "owning" corporation, served no function which could not have been suitably handled by Caldwell & Cook, Inc. or even by Sierra and Woodcroft. Separate ownership of the lots by Dorba and Velmar provided no additional protection against the threat of labor interference. Nor is it clear that such an arrangement fostered greater independence between Caldwell and Cook since it was the partnership (later Landorama, Inc.) subject to their mutual control, which initially distributed subdivided land to the "owning" corporations.

Petitioners Dewmar and Lumar failed to sustain their burden of proving that the principal purpose of their formation was not tax avoidance, but estate planning. There was no explanation why Caldwell and Cook could not have provided adequately for their wives through a transfer of shares of stock in Woodcroft and Sierra especially in view of the lack of any participation by the wives in the business activities of Lumar and Dewmar. The petitioners' reliance on cases where estate planning was recognized as a valid purpose is misplaced. Louisville Store of Liberty v. United

---

1. § 269 provides in pertinent part:
   (a) *In general.*—If—
   (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation * * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would

not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. * * *

States, 376 F.2d 314, 179 Ct.Cl. 847, (1967), the strongest of those cases, is distinguishable because there, there were several valid reasons for incorporation, which, the court decided, far outweighed any tax considerations. Here, only one reason for incorporation is advanced and the Tax Court rejected it, largely because it found the testimony of Caldwell and Cook unconvincing.

The Tax Court was not persuaded that risk minimization was the principal purpose for the incorporation of Mendon and Powder Mill, because of their small capitalization and because the assets of the owners and the other affiliated corporations were necessary to provide backing for their activities. It rejected the declarations of Caldwell and Cook as to their intent, and no other evidence of any substance was offered on the point. Finally, there was justification for concluding that there was an illegal purpose behind the formation of Landorama, Inc. This corporation supposedly assumed the. land development functions of the partnership in order to limit the owners' liability. But the partnership had previously taken over those duties from the Corporation, and no good reason was given why a new corporation was necessary.

■ Petitioners further argue that the Tax Court's refusal to apply §§ 61 and 482, because each corporation served a legitimate purpose, precludes application of § 269. But this confuses "a purpose," the continued existence of which may be enough to eliminate §§ 61 and 482, with "the principal purpose" to evade or avoid the Federal income tax, the initial presence of which governs § 269 and which may exist alongside other secondary reasons for the formation of the corporation.

■ Petitioners' second major contention on appeal is that the Tax Court improperly attributed to Caldwell and Cook the shares of stock of their wives in Lumar and Dewmar, respectively, in order to satisfy the 50 per cent stock ownership requirement of § 269. In fact, the holding of the Tax Court on this issue is unclear. Had the Tax Court specifically found that Caldwell and Cook were the beneficial owners of their wives' stock, which it did not do, § 269 could properly have been applied to deny the surtax exemption. Ach v. Commissioner of Internal Revenue, 358 F.2d 342 (6 Cir. 1966). To sustain the applicability of § 269 to this present case, however, without such a holding, requires this court either to attribute the wives' stock to the husbands through a broad interpretation of the Code's attribution rules, to apply § 269 to the wives' individual acquisition of control, or to disregard § 269's definition of "control" in favor of a definition, urged by the Commissioner, "based on board principles of tax law and the actualities of the situation." None of these grounds is persuasive, however. First, the Tax Court did not decide nor does the Commissioner argue that attribution rules apply in determining control under § 269. Indeed, this court would hesitate to upset the narrow system of stock attribution which Congress has so carefully established. See, e.g., 26 U.S.C.A. §§ 267(c), 318, 425(d) and 544(a). Second, it does not seem likely that Congress intended § 269 to apply, in surtax exemption cases, to the acquisition of control in only one corporation. Otherwise that section would deny a surtax exemption to a single corporation in no way connected by common ownership with other corporations. Although the language of § 269 would support such an interpretation, this court is inclined to limit § 269, in surtax exemption cases, to situations where there is control of two or more corporations. In this case, it is clear that the wives had no such additional controlling interests. Third, we are not persuaded to expand further § 269's specific definition of control, since there is already provision for consideration of the "actualities of the situation." See Ach v. Commissioner of Internal Revenue, supra. Accordingly, we reject these three grounds for affirmance and remand the case for

determination of the beneficial ownership of the wives' stock.

The decision of the Tax Court is affirmed with respect to petitioners Dorba, Velmar, Mendon, Powder Mill and Landorama, Inc. but is reversed and remanded with respect to Lumar and Dewmar.