MARC'S BIG BOY-PROSPECT, INC., ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 299-67—308-67. Filed September 29, 1969.

*Jacquin D. Bierman* and *Lloyd S. Jacobson*, for the petitioners.
*Denis J. Conlon*, for the respondent.

---

[1] Cases of the following petitioners are consolidated herewith: Marc's Big Boy-Appleton, Inc., docket No. 300-67; Marc's Big Boy-Specialty Products, Inc., docket No. 301-67; Marc's Big Boy-Point Loomis, Inc., docket No. 302-67; Bon Host Service Corp., docket No. 303-67; Marc's Big Boy-5th, Inc., docket No. 304-67; Wisconsin Big Boy Corp., docket No. 305-67; Marc's Big Boy-100, Inc., docket No. 306-67; Marc's Big Boy-Port, Inc., docket No. 307-67; and Marc's Big Boy-Capitol, Inc., docket No. 308-67.

1078

**OPINION**

Respondent assessed deficiencies against WBB under sections 61 and 482 by including in WBB's gross income and deductions the gross income and deductions of all the other petitioners plus those of Layton, Manitowoc, and Green Bay in order to prevent evasion of taxes and to reflect WBB's income clearly.

Respondent relies primarily on section 61 and alternatively on section 482. If he is correct under either, it is unnecessary for us to consider the other or to consider respondent's other alternative positions based on sections 269 and 1551 regarding the surtax exemptions of petitioners other than WBB.

## *WBB*

All the restaurants and the commissaries involved in this case were wholly owned by WBB which, in turn, was owned by Marcus and his family and Kilburg. The restaurants were set up and operated as subfranchisees of WBB. The commissaries were set up and operated as adjuncts to the restaurants.

WBB, as franchisee or subfranchisor, passed on its right and obligation under the franchise contract to its subfranchisees. In addition, WBB included in the subfranchise contracts certain provisions with

respect to management and administration which were not contained in the franchise contract. By virtue of its ownership of the subsidiaries and the subfranchise contracts, WBB had the power and authority to determine all policy including matters with respect to the financial affairs and operations of the restaurants, leasehold obligations, personnel practices and procedures, advertising, and purchases and sales of goods. WBB exercised this power and authority to determine such policies and implemented them by overseeing and supervising all aspects of the restaurant's business including the services provided by the commissaries. At times personnel directly employed by WBB would step in to perform particular restaurant functions.

For its services to the restaurants, WBB charged a fee based upon a sliding-scale percentage of gross sales. Marcus and Kilburg determined the formula by which such fee was computed.

Section 482,[10] which we hold controls the disposition of this case, provides that the Secretary or his delegate may allocate gross income and deductions among two or more organizations owned or controlled by the same interests if he determines that such allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of such organizations.

The Commissioner has considerable discretion in applying section 482. His determination must be sustained unless he has abused his discretion, and petitioner proves the determination to be arbitrary, capricious, or unreasonable. *Bush Hog Manufacturing Co.*, 42 T.C. 713, 724 (1964), acq. 1964–2 C.B. 4; *Pauline W. Ach*, 42 T.C. 114, 126 (1964), affd. 358 F. 2d 342 (C.A. 6, 1966), certiorari denied 385 U.S. 899 (1966); *Hamburgers York Road, Inc.*, 41 T.C. 821, 833 (1964), acq. 1965–2 C.B. 5; *Ballentine Motor Co.* v. *Commissioner*, 321 F. 2d 796, 800 (C.A. 4, 1963), affirming 39 T.C. 348 (1962); *Grenada Industries, Inc.*, 17 T.C. 231 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953), certiorari denied 346 U.S. 819 (1953). If the record before this Court fails to support the allocation, then we must conclude that the Commissioner abused his discretion. *V. H. Monette & Co.*, 45 T.C. 15, 36–37 (1965), affd. 374 F. 2d 116 (C.A. 4, 1967), acq. 1966–2 C.B. 6; *Bush Hog Manufacturing Co.*, *supra*. But if there is substantial evidence supporting the determination, it must be affirmed. *Advance Machinery Exch.* v. *Commissioner*, 196 F. 2d 1006, 1007–1008 (C.A. 2, 1952),

---

[10] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.

affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 835 (1952).

In *Hamburgers York Road, Inc., supra* at 833, we noted:

The purpose of said statute is to prevent the evasion of taxes by the *shifting of profits*, the making of fictitious sales, and other methods customarily used to "milk" a taxable entity. H. Rept. No. 2, 70th Cong., 1st Sess., pp. 16–17, reprinted in 1939–1 C.B. (Part 2) 395; S. Rept. No. 960, 70th Cong., 1st Sess., p. 24, reprinted in 1939–1 C.B. (Part 2) 426. *Ballentine Motor Co.*, 39 T.C. 348, 357, affd. 321 F. 2d 796 (C.A. 4).

The Commissioner may allocate income and deductions between commonly controlled corporations not because the common owner has the *power* to shift income but only where there has been *actual* shifting of income or deductions. *V. H. Monette & Co., supra* at 37; *Bush Hog Manufacturing Co., supra* at 725. Otherwise the provision would "punish the mere existence of common control or ownership" rather than "assist in preventing distortion of income and evasion of taxes through the exercise of that control or ownership." *Grenada Industries, supra* at 254–255. See also *Asiatic Petroleum Co. (Delaware) Ltd.*, 31 B.T.A. 1152, 1154–1158 (1935), affd. 79 F. 2d 234 (C.A. 2, 1935), certiorari denied 296 U.S. 645 (1935).

Some cases have involved a specific transaction or transactions between commonly controlled corporations in which the courts were concerned with whether the transaction or transactions resulted from arm's-length bargaining or were fair. See, e.g., *Ballentine Motor Co.*, 39 T.C. 348, 356–361 (1962), affd. 321 F. 2d 796 (C.A. 4, 1963), stating that a fair transaction or one resulting from arm's-length bargaining will not be disturbed; see also section 1.482–1(b)(1), Income Tax Regs., which states that the purpose of section 482 is to place a controlled taxpayer on a parity with an uncontrolled taxpayer and that the standard to be applied is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.[11]

In this case, however, respondent assessed the deficiencies against WBB by allocating to its gross income and deductions all the gross

[11] Sec. 1.482–1(c), Income Tax Regs., discusses the application of sec. 482:

(c) *Application.* Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. In determining the true taxable income of a controlled taxpayer, the district director is not restricted to the case of improper accounting, to the case of a fraudulent, colorable, or sham transaction, or to the case of a device designed to reduce or avoid tax by shifting or distorting income, deductions, credits, or allowances. The authority to determine true taxable income extends to any case in which either by inadvertence or design the taxable income, in whole or in part, of a controlled taxpayer, is other than it would have been had the taxpayer in the conduct of his affairs been an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.

Sec. 1.482–1(a)(6) defines "true taxable income" as "the taxable income * * * which would have resulted to the controlled taxpayer, had it in the conduct of its affairs (or, as the case may be, in the particular contract, transaction, arrangement, or other act) dealt with the other member or members of the group at arm's length. * * *"

income and deductions of the other petitioners herein plus Layton, Green Bay, and Manitowoc. He stated that this allocation was made to prevent evasion of taxes and to clearly reflect WBB's income. Respondent did not base the allocations on any particular transaction or transactions between WBB and its subsidiaries such as payment of salaries advertising expenses, or transfers of inventory. He suggested on brief that certain transactions failed to satisfy the arm's-length standard. His deficiency determination and conduct at trial, however, focused on whether the subsidiaries were formed and operated as separate taxable entities and as separate business enterprises. Petitioner WBB also sees the issues in these terms rather than in terms of specific transactions.

Thus, we shall follow the approach of *Hamburgers York Road, Inc.,* *supra,*[12] and ask whether petitioners established that respondent was arbitrary, capricious, or unreasonable in his determination which in effect is that, if WBB and its subsidiaries had dealt at arm's length as uncontrolled corporations, WBB would have required all profits of the subsidiaries to be turned over to it. Necessarily we shall examine the nature of the dealings between WBB and its subsidiaries.

This approach appears to be contemplated by the above-cited regulations and is indicated by comments of the Senate Committee on Finance in recommending the provisions for a corporate surtax exemption of $25,000 in the Revenue Act of 1950: [13]

The normal tax rate is made applicable to the entire normal tax net income of all corporations; the surtax rate applies to the corporation surtax net income in excess of $25,000. Under this plan, the so-called notch provisions are eliminated. It is not intended, however, that the exemption of the first $25,000 of a corporation's surtax net income from the surtax shall be abused by the splitting up, directly or indirectly of a business enterprise into two or more corporations *or the forming of two or more corporations to carry on an integrated business enterprise. It is believed that sections 45 [now 482] and 129 [now 269] will prevent this form of tax avoidance.* [Emphasis supplied.]

---

[12] "Common control, however, is not the end of the matter; for, as we stated in *Ballentine Motor Co., supra,* 'taxpayers owned or controlled by the same interests may enter into transactions *inter se* and if fair, or resulting from arm's length bargaining, such transactions will be undisturbed.' 39 T.C. at 357. Accordingly, if the respondent is to prevail on this issue in the instant case, it must still be found that Hamburger & Sons in the conduct of its affairs vis-a-vis York Road and in the transactions which it had with the latter corporation, did not deal with York Road at arm's length, as one uncontrolled corporation would have dealt with another uncontrolled corporation. In the light of the respondent's determination that all taxable income (actually, the equivalent of net profit) of York Road is to be included in the income of Hamburger & Sons, our more specific question becomes this: Have the petitioners established that the respondent was arbitrary, capricious, or unreasonable in his determination that if Hamburger & Sons and York Road had been dealing at arm's length as uncontrolled organizations, Hamburger & Sons would have required that all profits of York Road be turned over to it?" [*Hamburgers York Road, Inc.,* 41 T.C. at 835.]

[13] S. Rept. No. 2375, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 533–534. See *Dorba Homes, Inc.,* T.C. Memo 1967–150, partially reversed on other grounds, 403 F. 2d 502 (C.A. 2, 1968), which indicates that this approach does not automatically lead to upholding a reallocation under sec. 482 but rather calls for a review of the facts of each case.

Applying the above principles to the record before us, we uphold the Commissioner's determination based upon section 482. As explained below, we conclude there was a single, integrated, restaurant operation conducted and controlled by WBB through an arrangement which does not appear to have been equivalent to what would have been made had the parties dealt at arm's length.

The framework of the business was the franchise contract between WBB and its licensors, California Big Boy and Enterprises. This contract controlled the principal product to be sold and reserved the right to designate other products, and the trademarks and incidental designs, menus, recipes and formulas to be used in connection with the merchandising of food products.

The contract provided for operating procedures including requirements that WBB, as licensee, use its "best efforts" in merchandising Big Boy food products; maintain and make available to the licensors full and accurate records of sales; carry certain minimum amounts of products liability insurance; comply with all rules and regulations attached to the contract and all reasonable rules and regulations established later; join and maintain membership in local and national restaurant associations; and obtain the highest health, sanitation, and quality classification available from the appropriate governmental authority.

The franchise contract contemplated that WBB might conduct its restaurant operations through subsidiary corporations since it provided that only where WBB or "persons in control" of WBB owned the majority of the voting stock of the corporate subfranchisee was the consent of California Big Boy not required in order to grant a subfranchise. Additionally, WBB obligated itself to see that the terms and conditions imposed on it by the franchise contract were passed onto and observed by all of its subfranchisees. In the subfranchise contracts WBB formally passed on these terms and conditions to its wholly owned restaurant subsidiaries.

The subfranchise contracts were patterned after and worded substantially the same as the franchise contract, except for certain important particulars discussed below. The effect of passing on the terms and conditions of the franchise contract was to define for the restaurants: The products to be merchandised; the menus, recipes, formulas, trademarks, and designs to be used in the marketing process; and the services to be provided to each restaurant in order to commence operations, including the selection of a location, traffic planning and ground layout, training personnel, planning and developing and promoting the restaurant business and Big Boy products, and "the establishment of systems of operation, including accounting and commissary opera-

tions." In short, under the packaged deal provided in these contracts, about all WBB, Marcus, and Kilburg needed in order to open a restaurant was to provide personnel and capital and sources of supplies and foodstuffs to implement the grand design of the licensors. They could call on the licensors for the initial push.

As it developed WBB and its subsidiaries sought the help of the licensors in setting up each restaurant and in training personnel. Thus, except for financing, locating restaurants, and arranging leases, the terms and conditions of the franchise contract set the policies and operating procedures of the restaurants owned by WBB.

Integration of WBB and its restaurants was also maintained in the procedures for arranging locations, leases, and financing not because of requirements of the franchise and subfranchise contracts but because Marcus and Kilburg were the common denominators in these areas. Kilburg and Marcus personally chose each restaurant location, after initially calling on Wian's assistance in choosing the first location.

Marcus had the responsibility for obtaining financing and leases. He personally guaranteed the 10 bank loans, 9 of which were with the same bank. He testified that his own reputation was an important factor in obtaining credit for the various corporations. Two restaurants, one of which came into existence before WBB, were required to make security deposits which came from the initial capital obtained by Marcus. WBB was the original lessee for all but three restaurants and Bon Host because, according to Marcus, the lessors and mortgagees wanted WBB to be primarily liable rather than the corporate restaurant operator. This indicates that lessors and mortgagees depended upon WBB's reputation and financial ability rather than that of WBB's subsidiaries. Marcus acted for the lessors as president in three instances, and regarding another lease, was associated with the lessor and the persons acting for the lessor.

The leases-under which Layton and Green Bay operated required WBB, as lessee, to conduct "restaurant business similar to the business conducted *by* Lessee in Marc's Big Boys in the Milwaukee, Wisconsin, area." (Emphasis supplied.) Although other leases in evidence do not contain equivalent language, this language, appearing in these two 1963 leases, clearly indicates that WBB was the moving force behind the various Marc's Big Boy restaurants in Milwaukee and was viewed as such by WBB and these two lessors. Under these circumstances it is quite reasonable to assume that the dominant control of the corporations by Marcus through WBB was the factor which determined the structure of most of the lease transactions. By the same token respondent was not unreasonable in recognizing that this dependence on Marcus and WBB was an additional aspect tending to indicate the integration of the business.

We turn next to the manner in which business was conducted. The framework is set out in the portion of the subfranchise contract dealing with the services to be furnished by WBB. This contract contemplated more than merely opening a restaurant and commencing operation. It also embraced the close administration and supervision of the business on a constant and continuing basis. It provided that WBB would—

furnish from time to time * * * administrative counseling and advisory services and suggestions in planning, developing and promoting the restaurant business of the sublicensees and the sale of "BIG BOY" products, including specifically, advice, counsel and suggestions relating to the following: Menu planning and printing; recipes; selection of restaurant location; building plans; traffic planning and ground layout; advertising plans; specifications and use of trade symbols and promotional materials; business promotions and operation; pricing; employee training; and the establishment of systems of operation, including accounting and commissary operations. WISCONSIN BIG BOY shall administer for the sublicensee the recruitment, selection and training of personnel and shall maintain a complete supervisory staff, and shall perform bookkeeping and accounting services for sublicensee. * * *

Our conclusion that the apparent intent of this language was to impose comprehensive supervision and management by WBB upon its subsidiaries is borne out by WBB's subsequent conduct.

Marcus testified that he intended to use WBB for purposes of managing the restaurants so as to insulate himself from direct ownership. An aspect of this comprehensive management is the bookkeeping and accounting functions performed by WBB at the behest of Marcus. WBB kept separate books and records for each corporation which, of course, would be necessary to a significant extent for several purposes, including the establishment of the amount of rentals contingent upon gross sales, whether or not separate corporations were involved. See *Hamburgers York Road, Inc., supra* at 838. The address on each of the income tax returns of the subsidiaries was that of WBB. WBB itself paid bills sent to its subsidiaries, the expenses were allocated and charged to each of the subsidiaries according to the portion incurred by each. Checks were written in the name of each subsidiary on its respective checking account to reimburse WBB for these outlays and to meet other expenses generated by its particular activities. The checks, however, could be signed only by Marcus or his son, Steve, or one other WBB employee named Lowe. Restaurant managers had no authority to write checks. Each restaurant manager sent WBB its payroll time records and statements of the amount of inventory acquired so that WBB could make the appropriate payments out of each restaurant's account. The managers also made daily bank deposits and daily reports of receipts to WBB.

Thus, it appears that both the determination of financial and accounting policies and the implementation of these policies occurred in the personage of Marcus and the corporate form of WBB, and these activities of the subsidiary corporations were completely integrated through WBB.

Marcus had the power and responsibility to determine the basis on which salaries of officers for all the corporations were allocated. During the years in issue, however, only WBB reported that it paid any salary to an officer. The other corporations here involved did not report on their returns that any salaries were paid to officers. WBB paid a salary only to Kilburg who was listed as devoting full time to WBB even though he was an officer of each of the other corporations and supervised their activities. The reason for not paying salaries to any of the other officers and for allocating all of Kilburg's salary to WBB was not otherwise explained. These circumstances give rise to a reasonable inference that Kilburg managed his sphere of the business through WBB. And, further, they do not negate the likelihood that the other officers, and particularly Ben Marcus, performed services for all the corporations as representatives of WBB. In fact, it seems probable that the officers themselves regarded the corporations as facets of a single enterprise when the circumstances of this case are viewed in toto.

Likewise, the manner of recruiting and supervising restaurant personnel and the subordinated functions of the restaurant managers are circumstances indicating that the corporations should be viewed as a single enterprise. It appears that WBB exercised the complete control over the recruitment and selection of restaurant personnel as contemplated by the subfranchise contract. WBB employed persons for training managerial personnel also.

Many other aspects of the operations, while again not determinative in themselves, give them a factual context smacking of an integrated business.

The help-wanted advertisements were stated in terms of what the Marc's Big Boy restaurant "chain" could offer applicants. For example, manager cooks were offered accelerated training eventually leading to full-fledged restaurant manager positions at $8,000 to $10,000 per year plus benefits including the possibility of becoming a "franchised partner." Another ad stated that there was a "policy to promote from within." The wording and tone of these advertisements were not that of separate enterprises.

Insurance benefits were provided by means of master policies, and a single pension plan covered all the subsidiaries in issue except Specialty Products. The pension plan contemplated membership by cor-

porations or organizations "affiliated with the Marc's Big Boy organization." The tone and terms of the pension plan contemplated treatment of Marc's Big Boy employees on a uniform basis the same as they would have been had they all been employed by the same single enterprise.

While the restaurant managers performed a large number of functions, some of which may have involved their personal judgment and discretion, they were clearly subordinate to Kilburg, the division manager and WBB's three district managers, whom Kilburg referred to as "graduate managers." The restaurant managers only supervised the daily flow of food products and the conduct of their staffs in their respective stores. They in turn were completely subject to the control and supervision of WBB and the terms and conditions imposed upon them by the franchise contract as passed on by WBB in the sub-franchise contract.

Although WBB had been in business only a short time, it possessed the reputation, goodwill, resources, skills, and experience of Marcus and Kilburg and of its licensors by virtue of its franchise contract. WBB had the essential franchise and, in most cases, leasehold rights; it provided the essential experience and financial resources; and it furnished coordination and cohesion through the essential management, supervisory, and administrative services. These attributes were important and substantial factors in the operation of the restaurant business, and make this case similar to others in which like factors helped induce us to hold for respondent. *Charles Town, Inc.* v. *Commissioner*, 372 F. 2d 415, 419–421 (C.A. 4, 1967), affirming a Memorandum Opinion of this Court, certiorari denied 389 U.S. 841 (1967); *Spicer Theatre, Inc.*, 44 T.C. 198, 207 (1964), affd. 346 F. 2d 704 (C.A. 6, 1965); *Hamburgers York Road, Inc.*, *supra* at 837. Cf. *Pauline W. Ach, supra; Local Finance Corp.*, 48 T.C. 773 (1967), affd. 407 F. 2d 629 (C.A. 7, 1969). Even though the operations at different locations were separately incorporated, WBB conducted its affairs and those of its subsidiaries as a single integrated business enterprise in every important respect.

We cannot see how the business would have been conducted any differently had WBB not insulated itself from them by means of a separate corporation. Consequently there is no reason for holding that the Commissioner's reallocations to WBB were arbitrary unless WBB has shown that it was properly compensated for its services.

Several cases have reached similar conclusions on similar facts. In *Hamburgers York Road, Inc.*, *supra* at 837, we said:

Notwithstanding the foregoing facts and circumstances, petitioners here contend that the net profits of York Road should be fixed by charging against the sales of that store only the net current operating cost of such store, without any

consideration being given to the above-mentioned factors of goodwill, trade name, experienced buying and selling organizations, customer lists, and advertising format which Hamburger & Sons furnished for the use of York Road. We are confident that Hamburger & Sons would not have permitted such an arrangement, if it had dealt with York Road at arm's length. For such use of its business organization and assets, Hamburger & Sons would, we believe, have claimed for itself the profits in their entirety of the York Road segment of the integrated business.

Likewise, in *Spicer Theatre, Inc.*, *supra* at 207, we recognized that—

It was Spicer's reputation and capital that had made these operations profitable, Spicer's facilities were used, and these facilities were operated with Spicer's personnel except that for purposes of reporting to Governmental agencies the employees were listed as being those of Copley. * * * The anticipated profits generated by Spicer's reputation and effort, when projected over the reasonably short term of the lease, properly can be primarily attributed to the activities of Spicer and not Copley. * * *

Again, in *Charles Town, Inc.*, *supra* at 421, the Court of Appeals affirmed this Court's finding that Charles Town had done "all things necessary to earn the income in question" by operating the two racing meets. Charles Town was a party to the lease, obtained racing licenses in its name, hired and paid the necessary employees, entered into contracts for materials and services, acquired membership in a racing association, elected participation in the West Virginia Workmen's Compensation Plan and filed various State and Federal information tax returns. The Court of Appeals held that these circumstances supported the essentially factual determination of this Court. *Local Finance Corporation* v. *Commissioner*, 407 F. 2d 629 (C.A. 7, 1969), affirming 48 T.C. 773 (1967), and *Pauline W. Ach*, *supra*, are also cases in which the essential services were performed by the petitioner to whom the income was successfully allocated despite the existence of separate corporate entities. Compare *Philipp Bros. Chemicals, Inc. (MD)*, 52 T.C. 240 (1969), where we refused to permit the reallocation from the domestic sales corporations stating "We have no reason to conclude that these functions [bookkeeping and traffic] were other than purely routine or that 'New York' played any significant part in generating the business of 'Massachusetts.' " We found that all the domestic sales corporations adequately compensated "New York" for its routine services.

The flow of revenues from the subsidiaries to WBB and then to the licensors gives WBB's alleged position an unrealistic glow in view of the extensive control and management reposed in and exercised by WBB. According to the subfranchise contract WBB obtained its revenues from three sources: Franchise or license fees, payments for materials furnished, and administration or management fees. The franchise contract provided that WBB would receive certain materials

from the licensors without profit to them; in turn, the sublicense contract provided that WBB would furnish these materials to its subfranchisees without profit to WBB. WBB was obligated, under the franchise contract, to pay the licensors 1 percent of gross sales as a license fee; using the same definition of gross sales the subfranchise contract provided that the sublicensees would pay WBB 1 percent of gross sales as a subfranchise fee. Thus, on two items that one might expect an independent, arm's-length sublicensor to earn profits there could be none because WBB was obligated to pay out all that it was entitled to receive.

WBB's profits of $21,479, $30,827.38, and $22,430.40 in 1963, 1964, and 1965, respectively, must then have come from management and administration fees. Marcus testified that he and Kilburg based WBB's fee for administration and management on gross sales of the restaurant so as to allow WBB "a small profit." [14] There is nothing else to indicate why they arrived at the particular formula. Nor does the testimony in footnote 14, *supra*, indicate the nature of their investigation or the basis of comparison with other businesses in the industry.

The subfranchise contract provided that the sublicensees would pay WBB an administration fee at the end of each 4-week period. The fee was set at 3 percent of gross sales; but if gross sales for each 52-week period failed to exceed $400,000, the fee would be 2 percent. Furthermore, if the pretax net profit of a sublicensee were less than $1,000 during each 52-week period of operation, no administration fee would be charged. This formula does not appear to have enhanced the trend of WBB's gross receipts and profits for the years in issue despite the increase in gross receipts of the restaurants from $2,755,292.81 in 1963 to $4,918,457.82 in 1965.

Such a fee structure between a parent corporation and its subsidiaries must be scrutinized closely whenever it is questioned and there is a presumption that it is inadequate attaching to the Commissioner's reallocation under section 482. The fee structure used by WBB permits a reasonable inference that it was a means for shifting or splitting

---

[14] The following is taken from the transcript of the respondent's cross examination of Ben Marcus:

"Q. Who determined the franchise fee that would be charged? I mean, who determined this management fee that would be charged?

"A. I think Mr. Kilburg and I sat down and reviewed our costs of administration and management and figured the—probably a small profit for the supervision.

"Q. Was that fee suggested to you by California?

"A. Well, we checked to see as to what the—generally is being charged in the industry, and there was no set fee. It ranged all the way from two percent to five percent, I think it is.

"Q. Of gross sales?

"A. Of gross sales."

There was no other evidence relating to the basis for the fee nor to the nature of services provided by others in the industry so as to permit comparisons.

income so as to avail WBB and its shareholders of the possible tax advantages of maintaining several corporations. Most significant, WBB has not tried to show that its fee structure is the equivalent of an arm's-length result or that it adequately, fairly, or reasonably compensated for the extensive services, resources, and rights provided by WBB to the subsidiaries.[15] In view of WBB's pervasive and complete management and control of its subsidiaries, we feel that a sound explanation is necessary to avoid the conclusion that WBB's reported earnings were substantially less than they should have been; we will not resort to speculation in deciding whether the Commissioner was arbitrary in determining, in effect, that WBB failed to require proper compensation. See *Grenada Industries, Inc., supra* at 258–259, where we said:

> To the extent that the arrangement between Hosiery and Industries resulted in a larger concentration of profits in the hands of Hosiery, to the detriment of Industries, this case presents a typical situation for the application of section 45 [now 482].
>
> \*      \*      \*      \*      \*      \*      \*
>
> In any event, the burden was on Industries to prove the value of the services Hosiery rendered, and it has provided no more convincing evidence of that value than the salaries in question. Petitioners insist that once they have shown application of section 45 and the allocations thereunder to be arbitrary, the burden shifted to respondent to prove a proper allocation. While there may be doubt as to the validity of this contention, we need not consider it, because we do not believe that Industries can establish that the allocation of Hosiery's income made to it by respondent was arbitrary *without showing the value of the services it received from Hosiery.* [Emphasis supplied.]

Petitioner's contention that respondent did not put the fee structure in issue is not well taken. It is true that there are no specific transactions in issue. Rather it is the entire course of dealing between WBB and its subsidiaries, and the fee structure on which the dealings were based, which are relevant. The deficiency notice cited section 482 in reallocating the income to WBB (*Ballentine Motor Co*, 39 T.C. at 358), and its petition (see par. 5) amply demonstrates that it recognized that the issue based on section 482 necessarily involved the nature of the relationship between WBB and the other corporations. See also *Nat Harrison Associates, Inc.*, 42 T.C. 601, 617 (1964), acq. 1965-2 C.B. 5. Obvious aspects of that relationship were the financial arrangements. The regulations and previous case law also indicate the relevance of the fee structure.

What we have said regarding the integrated operation of the restaurants seems to be substantially true for Bon Host and Specialty

---

[15] We need not deal with the question of whether these standards are different, and, if so, which one is applicable herein. See *Frank* v. *International Canadian Corporation*, 308 F. 2d 520, 528–529 (C.A. 9, 1962), and cases cited therein; *Eli Lilly & Co.* v. *United States*, 372 F. 2d 990, 999–1000 (Ct. Cl. 1967).

Products also except that they were not specifically governed by the franchise and subfranchise agreements, although such agreements to which WBB was a party contemplated commissary operations. Bon Host and Specialty Products were, however, set up to serve only the restaurants which were subject to the subfranchise agreements and they dealt with no one else insofar as we can determine. The record does not indicate that WBB treated them any differently than it treated the restaurants. They both reported administration expenses on their tax returns.

It is interesting and helpful to note that Bon Host's 1963 pretax net income of $22,945.02 on sales of $115,944.72 did not increase greatly, in relation to the increase in sales, for 1964 and 1965. Even though gross sales in those jumped to $494,332.71 and $553,436.51, respectively, pretax net income was $31,329.74 and $34,125.84, respectively. In view of the control relationships here involved, these figures lend some support to an inference that WBB artifically shifted income with respect to Bon Host.

The same might be said of Specialty Products which reported pretax net income of $9,116.53 on sales of only $38,325.26 in its first year of operation in 1965. This relatively large return on such relatively small gross sales in 1965, a year in which 7 out of the 10 restaurants here involved had gross sales of over $400,000, and the fact that Specialty Products does not seem to have existed except on paper (as discussed below) tends to render incredible Marcus' uncorroborated testimony that a separate entity was necessary in order to obtain broker's discounts on large volume purchases of potatoes.[16] Moreover, Specialty Products had no employees and no equipment nor is any place of actual operations revealed in the record. The absence of these factors are particularly unusual since Marcus testified that Specialty Products purchased millions of pounds of potatoes, processed them, and sold them to the restaurants.[17]

Further, WBB provided the same bookkeeping and administrative services for Specialty Products and Bon Host as were performed for the restaurants. Since they also were wholly owned by WBB and had the same officers as the restaurants, we think it a fair inference that

---

[16] We were not referred to any law or regulation or other source supporting this testimony. Moreover, such a statute or regulation would not be determinative even if in existence. *Local Finance Corp.*, 48 T.C. at 793–794, and 407 F. 2d at 633.

[17] Also, it does not appear that Specialty Products reported figures on its income tax return relating to the processing or distributing of potatoes, nor that it borrowed funds, leased property, or adopted a pension plan. Under all these circumstances it was obviously a sham. *Moline Properties* v. *Commissioner*, 319 U.S. 436 (1943) ; *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949) ; *Aldon Homes, Inc.*, 33 T.C. 582 (1959).

We need not discuss the sham theory in regard to the other subsidiaries because of our holding under sec. 482. We think that they were not shams under the tests posed by the cases just cited as the facts of this case amply demonstrate.

they were operated as part of the enterprise by WBB in the same dominant manner as the restaurants, with due allowance for the difference in functions.

We hold that the record sustains the Commissioner's determination that WBB generated the income for the years in issue by conducting an integrated business enterprise through its divisions set up as wholly owned subsidiary corporations. We do not impinge upon the limits of those cases holding in favor of the taxpayers where there is a significantly lesser degree of integration of operations. *Bush Hog Manufacturing Co., supra; V. H. Monette & Co., supra.* We are moved primarily by the fact that complete policy-making authority and management control was actually exercised by WBB and by Marcus and Kilburg acting through WBB and by the lack of showing of proper compensation for WBB by the subsidiaries. We conclude that WBB should be charged with earning the income of the controlled corporations in order to prevent distortion of its income. *Pauline W. Ach, supra; Hamburgers York Road, Inc., supra.*

While there are many factual parallels between *Bush Hog Manufacturing Co., supra,* and WBB's situation, we note that in that case the subsidiary sales companies paid Manufacturing at least as much for the machinery as would an unrelated distributor and, except for relatively minor sums attributable to compensation of officers, the management fee appears to have been reasonable, there being no evidence that the fee was inadequate. Moreover, respondent's theory that Manufacturing actually earned the income reported by the sales companies rested solely upon a realignment of sales territories upon the formation of new sales companies and a subsequent drop in the income of old sales companies. As petitioner's brief herein recognizes, at page 42, we held that such fact failed to support respondent's determination because—

He [the Commissioner] has not determined that the income and deductions of the new sales companies should be allocated to the old sales companies but rather that the income and deductions of all the sales companies, including the two original ones, should be allocated to Manufacturing. * * * [*Id.* at 725]

Respondent's theory under section 482 herein rests upon the nature and extent of the services performed by WBB.

Likewise, there are important dissimilarities with *V. H. Monette & Co., supra,* wherein respondent's—

principal contention for the application of section 482 is that deductions were arbitrarily allocated among the several corporations so that each corporation's net income would fall just under the $25,000 surtax exemption allowed by section 11(c). * * * [*Id.* at 36–37]

There again we were unable to find facts supporting respondent's contention. The basis for the Commissioner's reallocation of the keyman's

salary was unjustified. *Id.* at 37. Further, significant operative authority was reposed in and exercised by the various corporations.

The facts in *Chelsea Products, Inc.*, 16 T.C. 840 (1951), affd. 197 F. 2d 620 (C.A. 3, 1952), were similar to those at hand. A majority of this Court, however, held that the predecessor to section 482 was not applicable because—

the Commissioner has not distributed, apportioned or allocated gross income, deductions, credits, or allowances between or among such trades or businesses as contemplated by the statute where section 45 is to be applied. On the contrary respondent has "combined" the "net" income of the sales companies with the "net" income of petitioner. Section 45 does not grant such authority to respondent. * * * [*Id.* at 851]

Four of the five dissenters felt that section 45 was applicable [18] and that "Petitioner has failed to prove that it received fair value, or that its subsidiaries performed any valuable function." *Id.* at 853.

*W. Braun Co.* v. *Commissioner*, 396 F. 2d 264 (C.A. 2, 1968), reversing a Memorandum Opinion of this Court, based the reversal on a finding that the Lanolin Plus account was transferred to the subsidiary for sound business reasons and that the parent was adequately compensated.

Some of the cases involving section 482 discuss whether there was a proper business purpose for multiple incorporations. Discussions of the purpose of or reason for the transaction are helpful in explaining what was done,[19] but neither tax motivation nor lack of business purpose is necessary to a finding of distortion if the transaction has the effect of distorting income in situations contemplated by section 482.[20]

We recognize that in some cases a partial allocation may be appropriate. *Pauline W. Ach, supra; Nat Harrison Associates, Inc., supra* at 617–623. Our decision, however, is that the Commissioner was not unreasonable or arbitrary in allocating all the income to WBB. Furthermore, this approach is consistent with the approach of the parties as to the issue involved, and the record affords little or no

---

[18] In *Ballentine Motor Co., supra,* fn. 10 at 359, we distinguished *Chelsea Products* on the ground that the reallocation was based on the theory of disregarding the corporate existence of the three corporations which theory was previously rejected outright because of the principles of *Moline Properties* v. *Commissioner,* fn. 17, *supra,* and *National Carbide Corp.* v. *Commissioner,* fn. 17, *supra.* We need not deal with the Commissioner's tactics in *Chelsea Products* because he followed the literal language of the statute in making the reallocation of gross income and deductions to WBB. Moreover, see *Philipp Bros. Chemicals, Inc. (MD),* 52 T.C. at 251, where we state that the allocation of net income is now proper.

[19] See *Borge* v. *Commissioner,* 405 F. 2d 673 (C.A. 2, 1968), affirming a Memorandum Opinion of this Court; *Spicer Theater, Inc.,* 44 T.C. at 206–207; *Pauline W. Ach,* 42 T.C. 114; *Bush Hog Manufacturing Co.,* 42 T.C. 713; and *V. H. Monette & Co.,* 45 T.C. 15.

[20] *Philipp Bros. Chemicals, Inc. (MD), supra* at 251; *Local Finance Corp., supra; Simon J. Murphy Co.,* 22 T.C. 1341, 1343 (1954), reversed on other grounds 231 F. 2d 639 (C.A. 6, 1956); *Eli Lilly & Co.* v. *United States, supra* at 999; *Dillard-Waltermire, Inc.* v. *Campbell,* 255 F. 2d 433, 436 (C.A. 5, 1958).

rational basis for making a partial allocation based upon our guess of what fee should have been charged by WBB.[21]

Having upheld the deficiencies assessed against WBB, there is no need to reach the issues posed by the deficiencies alternatively assessed against the other petitioners.

> *Decision will be entered for the respondent in docket No. 305–67.*
>
> *Decisions will be entered under Rule 50 in all other dockets.*

---

[21] Cf. *Helvering* v. *Taylor,* 293 U.S. 507 (1935) ; *Burnet* v. *Houston,* 283 U.S. 223 (1931) ; *C. L. Nichols,* 43 T.C. 135 (1964).