LIKINS-FOSTER HONOLULU CORP., ALIAMANU HOMES, LTD., LIKINS-FOSTER TOPEKA CORP., LIKINS-FOSTER SALINA CORP., LOMITA HOMES, INC., CARDIFF HOMES, INC., HIGHLAND PARK HOMES, INC., LIKINS-FOSTER OLATHE CORP., COCHITA PUMICE CO., BRIGGS RENTAL COMPANY, FOSTER HOMES, LTD., FOSTER DEVELOPMENT CORP., CENTRAL DEVELOPMENT CORP., CHAMPLIN CORP., ROY TURNER & ASSOCIATES, LTD., CIELO VISTA CORP., T. JACK FOSTER & SONS, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Likins-Foster Honolulu Corp. v. Commissioner
Docket No. 5361-78.
United States Tax Court
T.C. Memo 1985-572; 1985 Tax Ct. Memo LEXIS 58; 50 T.C.M. (CCH) 1465; T.C.M. (RIA) 85572; November 25, 1985. *58 Ps were members of an affiliated group which filed consolidated returns during the years in issue. LFH was the common parent of the affiliated group. On August 29, 1962, LFH received final payment of a condemnation award as a result of condemnation litigation initiated by the United States in 1957 against properties owned by corporations of which LFH was a shareholder. Held, such payment was received by LFH in exchange for its stock in the corporations and therefore constitutes personal holding company income within the meaning of section 543. Held further, amounts allocated to LFH as interest income under section 482 constitute personal holding company income within the meaning of section 543. Krueger Co. v. Commissioner,79 T.C. 65 (1982). Valentine Brookes and Lawrence v. Brookes, for the petitioners. Joyce E. Britt, for the respondent. NIMS
MEMORANDUM OPINION NIMS, Judge:* *59 Respondent determined deficiencies in petitioners' consolidated Federal income taxes as follows: Taxable Year Ended
Deficiency
June 30, 1961
$101,799.18
June 30, 1963
224,543.80
June 30, 1964
206,238.71
June 30, 1965
88,687.12
June 30, 1966
47,401.47
June 30, 1967
41,172.79
After concessions, the issues remaining for decision are: (1) whether final payment of a condemnation award received by petitioner in 1962 as a result of condemnation litigation initiated by the United States in 1957 against properties owned by corporations of which petitioner was a shareholder constitutes personal holding company income within the meaning of section 543; [1] and (2) whether amounts allocated to petitioner as interest income under section 482 constitute personal holding company income within the meaning of section 543. Resolution of the first issue turns on whether the payment constitutes a liquidating dividend or payment on a claim for just compensation distributed to petitioner in a previous year. If payment on a claim for just compensation, we must also determine the character of the gain realized by petitioner on the receipt of such payment. The case was submitted *60 fully stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Likins-Foster Honolulu Corporation (hereinafter referred to as LFH or petitioner) is the common parent of an affiliated group that filed consolidated returns for the taxable years ending June 30, 1961, and June 30, 1963 through June 30, 1967. The capital stock outstanding and issued by LFH was owned as follows: Shareholder
Percent of
Stock Owned
T. Jack Foster
75
T. Jack Foster, Jr.
8 1/3
John Foster
8 1/3
Richard Foster
8 1/3
During the years in issue, the consolidated group consisted of the following corporate entities: Aliamanu Homes, Ltd., Likins-Foster Topeka Corp., Likins-Foster Salina Corp., Lomita Homes, Inc., Cardiff Homes, Inc., Highland Park Homes, Inc., Likins-Foster Olathe Corp., Cochita Pumice Co., Briggs Rental Company, Foster Homes, Ltd., Foster Development Corp., Central Development Corp., Champlin Corp., Roy Turner & Associates, Ltd., Cielo Vista Corp. and T. Jack Foster & Sons, Inc. (hereinafter referred to collectively as petitioners). Petitioners' principal place of business was Foster City, California, at the time the petition herein was filed. During the years *61 in issue, petitioners were cash basis taxpayers. Issue 1. Condemnation Award
Prior to February 11, 1958, LFH filed consolidated returns with Likins-Foster Ord Corp. (Ord), Likins-Foster Monterey Corp. (Monterey), Likins-Foster Biggs Corp. (Biggs) and Likins-Foster El Paso Corp. (El Paso) (hereinafter referred to collectively as the Wherry corporations). From and after February 10, 1958, all of the capital stock outstanding and issued by the Wherry corporations was owned as follows: Number
Percent of
Shareholder
Of Shares
Stock Owned
LFH
119
79 1/3
T. Jack Foster
23 1/4
15 1/2
T. Jack Foster, Jr.
2 7/12
1 13/18
John R. Foster
2 7/12
1 13/18
Richard H. Foster
2 7/12
1 13/18
Because LFH ceased to own at least 80 percent of the stock of the Wherry corporations as of February 10, 1958, the Wherry corporations became ineligible to file consolidated returns with LFH as of that date. Therefore, on or about October 5, 1959, each of the Wherry corporations filed a separate corporate return for the taxable period February 11, 1958 to June 30, 1958, and for the fiscal year ended June 30, 1959. In 1950, Briggs and El Paso entered into agreements with the Secretary of the Air Force pursuant to the provisions of *62 the Wherry Act for the lease of land and construction of 400 houses each at Biggs Air Force Base, El Paso County, Texas. Ord and Monterey entered into similar agreements with the Secretary of the Army in 1951 and 1952, respectively, for the construction of 500 houses each at Fort Ord Military Reservation, Monterey County, California. The housing construction was financed under Title VIII of the National Housing Act as in effect prior to the enactment of the Housing Amendments of 1955. On October 30, 1957, the United States filed in the United States District Court for the Western District of Texas a complaint in condemnation and declaration of taking against Biggs and El Paso and deposited $2 as estimated just compensation. The United States subsequently deposited on June 6, 1958, additional estimated compensation of $171,500 and $166,500 for Biggs and El Paso, respectively. The United States filed a similar complaint and declaration of taking against Ord and Monterey on November 1, 1957, in the United States District Court for the Northern District of California.On the filing date, the United States deposited $318,827 and $463,226 as estimated Just compensation for Monterey and *63 Ord, respectively. The District Court entered Judgment on the date the complaints were filed that title to the property was in the United States and that just compensation therefore would be ascertained and awarded in the proceeding before it. Subsequent to the entry of these judgments, the Wherry corporations each filed a notice of appearance in which each stated that it made no objection to the taking of its property but demanded a jury trial as to just compensation. On August 19, 1958, Ord and Monterey filed motions for withdrawal of the funds deposited by the United States in the District Court in California. Biggs and El Paso filed similar motions on August 20, 1958, with the District Court in Texas. On August 21, 1958, the District Court in California entered an order for the payment of $463,226 and $318,827 to Ord and Monterey, respectively. These amounts were withdrawn pursuant to the order on August 27, 1958, and deposited in LFH's bank account. Similarly, on August 25, 1958, the District Court in Texas entered an order for payment of $171,500 and $166,500 to Biggs and El Paso, respectively. These amounts were withdrawn pursuant to the order on September 2, 1958, and *64 deposited in LFH's bank account. On September 5, 1958, LFH entered on its books a credit of $888,576.13 to "Gain on Sale of Assets", which represented its 79 1/3 percent share of the total amounts withdrawn from the courts. On August 11, 1958, each of the Wherry corporations adopted a plan of liquidation which they reported on their separate returns for the taxable year ended June 30, 1959, as a liquidation under section 337(a). Each corporation reported that its principal asset was a group of leasehold improvements on which condemnation proceedings were underway and that such corporation had received deposits representing just compensation for the leasehold improvements. The Wherry corporations further reported that they could not yet determine the amount of gain realized on the condemnation and even if they could, no gain was taxable to them under section 337. By August 8, 1959, all assets of the Wherry corporations, including the claim of each corporation against the United States in connection with the condemnation proceedings, had been distributed to their shareholders. On June 29, 1960, the United States District Court for the Northern District of California entered a consolidated *65 order of payment pursuant to the jury verdict in the amount of $1,194,181.94, plus interest on part of that amount, in favor of Ord and Monterey. Since the United States had previously paid $782,053, the court ordered payment to Ord and Monterey in the amount of $467,813.14. The United States Court of Appeals for the Ninth Circuit affirmed the District Court's judgment on October 1, 1962. On August 7, 1962, the United States District Court for the Western District of Texas entered a judgment pursuant to the jury verdict in the amount of $1,700,000 in favor of the former shareholders of Biggs and El Paso. The former shareholders of Biggs and El Paso had been made parties defendant to the condemnation proceedings after liquidation of Biggs and El Paso under the plan of liquidation adopted August 11, 1958. Since the United States had previously paid $338,000, the Court ordered payment of $1,362,000 plus interest. Pursuant to this order, the United States deposited $1,765,920.57 with the court on August 15, 1962, and the former shareholders of Biggs and El Paso withdrew that amount on August 29, 1962. Neither LFH and subsidiaries nor Ord, Monterey, Biggs or El Paso in separate returns *66 reported any income from gain on the condemnation of the properties of the Wherry corporations in fiscal years ended June 30, 1957, June 30, 1958 or June 30, 1959. LFH and subsidiaries reported capital gains in the amount of $891,225.56 from "gain on condemnation of Wherry corporations" on their consolidated return for fiscal year ended June 30, 1960. LFH and subsidiaries reported additional capital gains of $1,396,115.09 on their consolidated return for fiscal year ended June 30, 1963, as LFH's 79 1/3 percent share of the final condemnation award payment received on August 29, 1962. In the statutory notice of deficiency issued for the years in question, respondent determined that $1,098,022.44 of the final condemnation payment received by LFH on August 29, 1962, constituted a liquidating distribution and therefore was subject to the personal holding company tax imposed by section 541. [2] Respondent argues that because the claims for just compensation received by LFH in the liquidation of Biggs and El Paso had no ascertainable fair market value on the date of the distribution, the transaction remained open for purposes of determining LFH's gain on the liquidation. Respondent therefore *67 contends that a subsequent payment made on the claims should be treated as an amount received in exchange for the liquidated corporations' stock. Because section 543 defines gains from the sale or exchange of stock as personal holding company income, respondent concludes that the payment in question constitutes personal holding company income. [3] *68 In the event we find that the claim for just compensation had an ascertainable fair market value when distributed, respondent concedes that the payment in issue would not constitute personal holding company income within the meaning of section 543. Respondent alternatively argues, however, that a payment received on a claim would be ordinary income rather than capital gain. Petitioners do not dispute that the gain portion of a liquidating dividend would constitute personal holding company income within the meaning of section 543. Rather, petitioners contend that the claim for just compensation had an ascertainable fair market value on distribution. Thus, petitioners conclude that the payment they received in 1962 was payment on a claim distributed in a prior year rather than a payment received in exchange for their stock. Petitioners further contend that the claims for just compensation constitute "other evidences of indebtedness" within the meaning of section 1232, and therefore, the payments made on such claims are considered made in exchange therefor. Petitioners therefore conclude that they realized capital gain rather than ordinary income on receipt of the payment. We first consider whether the claims for just compensation had an ascertainable fair market value on the date of distribution. When an asset having no ascertainable fair market value is received in a corporate liquidation, the transaction remains open and a subsequent payment *69 realized upon that asset is treated as an amount received in exchange for the stock of the liquidated corporation. Doering v. Commissioner,39 T.C. 647, 649 (1963), affd. 335 F.2d 738 (2d Cir. 1964); Westover v. Smith,173 F.2d 90 (9th Cir. 1949). However, it is only in "rare and extraordinary" circumstances that property received on liquidation of a corporation will be considered unsusceptible of valuation. Section 1.1001-1, Income Tax Regs.; Slater v. Commissioner,356 F.2d 668, 670 (10th Cir. 1966), affirming a Memorandum Opinion of this Court. Nevertheless, the burden still rests with petitioners to establish that the claim was susceptible of valuation at the time of the liquidating distribution. Rule 142(a). On brief, but not in their pleadings, petitioners argue that the Court previously determined the claims' date of distribution value in Foster v. Commissioner,T.C. Memo. 1966-273, modified and remanded on a different issue sub nom. Likins-Foster Honolulu Corp. v. Commissioner,417 F.2d 285 (10th Cir. 1969). Petitioners therefore contend that because they and respondent were parties to that proceeding the doctrine of collateral estoppel prevents respondent from now arguing *70 that the claims were not susceptible of valuation on the date of distribution. Collateral estoppel and res judicata, however, are affirmative defenses which must be raised in the pleadings or by motion. Jefferson v. Commissioner,50 T.C. 963, 966 (1968); Rule 39. Since petitioners did not raise the issue of collateral estoppel in the pleadings or by motion, we need not and do not decide that issue here. [4]
We thus turn to an examination of the record before us to determine whether petitioners have satisfied their burden of proving that the claims of Biggs and El Paso against the United States had an ascertainable fair market value on the date of distribution. [5] *71 On this record, we find that petitioners have failed to satisfy their burden. In In Re Steen,509 F.2d 1398 (9th Cir. 1975), the Ninth Circuit, the Court to which an appeal from this case would lie, held that a right to payment which depended entirely upon a favorable judicial decision on a novel question of state law had no ascertainable fair market value prior to such decision. In so holding, the Court, quoting Burnet v. Logan,283 U.S. 404, 413 (1931), regarded payment vel non as "wholly contingent upon facts and circumstances not possible to foretell with anything like fair certainty." 509 F.2d at 1403. For the reasons discussed below, we think the claims herein are similarly contingent. Prior to their liquidation, Biggs and El Paso had requested a jury trial to determine the amount of just compensation for the condemned assets. The final determination of this issue did not occur until August 7, 1962, when the District Court in Texas entered a judgment pursuant to the jury verdict approximately three years after the claims had been distributed in liquidation. Petitioners have presented *72 no evidence suggesting that the amount of just compensation, if any, which the jury might award to Biggs and El Paso in the condemnation proceedings was ascertainable prior to the jury's verdict. Indeed, the record contains strong evidence that petitioners considered the value of the claims unascertainable at the time of the distribution. On their separate returns for fiscal year ended June 30, 1959, the Wherry corporations reported that they could not yet determine the amount of gain realized on the condemnation of their property. Further, LFH did not assign a value to the claims when reporting its gain from the liquidation on its tax return for fiscal year ended June 30, 1960. Consequently, we must find that petitioners have failed to satisfy their burden of proving that the value of the claims was ascertainable on the date of distfribution. We therefore conclude that LFH received the final condemnation award payment in exchange for stock in Biggs and El Paso and that such payment constitutes personal holding company income within the meaning of section 543. Because respondent agrees that petitioners properly reported the gain from the receipt of such payment as capital gain *73 income if we find that the claims had no ascertainable fair market value on the date of distribution, we need not further consider the character of the gain for income tax purposes. Issue 2. Amounts Allocated as Interest Income
In the notice of deficiency, respondent allocated under section 482 the following amounts as interest income from Roy Turner and Associates, Ltd., a member of the consolidated group, to LFH: Year
Amount
June 30, 1963
$64,366.80
June 30, 1964
128,182.92
June 30, 1965
128,472.41
June 30, 1967
9,669.17
Respondent determined that the amounts allocated as interest income under section 482 constituted personal holding company income within the meaning of section 543. Petitioners concede the amounts allocated as interest income under section 482 for Federal income tax purposes. Petitioners, however, contest respondent's determination that such amounts constitute personal holding company income. Under section 543(a)(1), "personal holding company income" includes "interest". We have previously determined that interest for purposes of section 543(a)(1) includes amounts allocated as interest income under section 482. Krueger Co. v. Commissioner,79 T.C. 65 (1982). Thus, based *74 on our decision in Krueger, we find that the amounts allocated to petitioner as interest income under section 482 constitute personal holding company income within the meaning of section 543(a)(1). Petitioners urge us to reconsider our holding in Krueger. They contend that if amounts allocated to a taxpayer as interest under section 482 are treated as personal holding company income, the taxpayer is placed in the impossible position of having to timely file a personal holding company tax return showing the receipt of interest income and having to timely pay personal holding company tax on that amount prior to respondent's allocation of such income. But this assertion is belied by the facts. Respondent has not asserted that petitioners were in any way delinquent in failing to file personal holding company returns in the first instance. Respondent did not seek to impose additions to tax under either section 6651(a) (failure to timely file a return) or section 6653 (failure to pay tax). In the event respondent had done so, petitioners' argument might prove to be a persuasive defense to the imposition of such additions, although we are not required to and do not decide this issue here.This *75 argument of petitioners, however, in any event does not go to the merits of the question of whether amounts allocated as interest under section 482 should be precluded from classification as interest for purposes of section 543. We are also unpersuaded by petitioners' contention that the treatment of amounts allocated under section 482 as personal holding company income does not further the purpose of the personal holding company provisions. Petitioners maintain that the purpose of those provisions is to compel the personal holding company to pay dividends and that, when interest income is not actually paid but instead is merely allocated under section 482, there is nothing for the corporation to distribute. This argument was previously considered and rejected in Krueger Co. v. Commissioner,supra.We therefore will not reconsider it here. Petitioners finally argue that section 1.482-2, Income Tax Regs., which was added in 1968, and which provided for the allocation of interest between controlled parties who had made an interest-free loan between themselves, should not have been retroactively applied to the years in issue. Petitioners contend that because retroactive application *76 was improper, we should not find that the amounts allocated as interest income under section 482 constitute personal holding company income. We are unpersuaded by this argument. In Kerry Investment Company v. Commissioner,500 F.2d 108 (9th Cir. 1974), affg. in part and revg. in part 58 T.C. 479 (1972), the Ninth Circuit rejected the taxpayer's argument that the Commissioner abused his discretion in applying section 1.482-2, Income Tax Regs., retroactively. We do not believe petitioners have been unfairly or improperly dealt with by the retroactive application of the regulations in question. The regulations are, in fact, particularly apt in the situation before us. In Latham Park Manor, Inc. v. Commissioner,69 T.C. 199, 212 (1977), affd. per curiam 618 F.2d 100 (4th Cir. 1980), we applied these particular regulations and said the following: We think the disputed regulations are consistent with the legislative purpose and the broad, comprehensive language of section 482. The section contemplates that transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes. *77 The regulations embody the declared legislative purpose to authorize the distribution of income or deductions among commonly controlled taxpayers to prevent evasion of taxes "by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of 'milking.'" H. Rept. 2, 70th Cong., 1st Sess., 1939-1 C.B. (Part 2) 384, 395; Ach v. Commissioner,42 T.C. 114, 125-126 (1964), affd. 358 F.2d 342 (6th Cir. 1966), cert. denied 385 U.S. 899 (1966). An obvious method which can be used to milk one commonly controlled organization for the benefit of another is the making of interest free loans. Under this method, the lending entity, by not reporting interest on the loans, has lower earnings and, consequently, lower taxes. By not paying interest, the borrowing entity, if it has no net taxable income, merely eliminates a deduction which otherwise would increase its losses. As a group the commonly controlled organizations pay less income tax than they would if they had dealt at arm's length and charged interest on the loans. We think this is the situation before us. The regulations are an appropriate reflection of the thrust of section 482, and whether *78 or not retroactive we can perceive no element of unfairness in this application here. By no stretch of the imagination is this a situation where the element of surprise is introduced by a new regulation taking a wholly unexpected new direction in its interpretation of an existing statute. The Eighth Circuit Court of Appeals, in Kahler Corporation v. Commissioner,486 F.2d 1 (8th Cir. 1973), reversing and remanding 58 T.C. 496 (1972) on a separate issue, at 5, squarely held that the Commissioner did not abuse his discretion in applying section 1.482-2, Income Tax Regs., retroactively, and the Ninth Circuit cited Kahler with approval on this point in a footnote in Kerry Investment Company v. Commissioner,supra,500 F.2d at 109 n.2. The Supreme Court's decision in Central Illinois Public Serv. Co. v. United States,435 U.S. 21 (1978), does not change this result. Petitioners argue that because the Ninth Circuit rendered its decision in Kerry Investment Company prior to the Supreme Court's decision in Central Illinois Public Serv. Co. v. United States,supra, we should reconsider whether respondent abused his discretion in applying section 1.482-2, Income Tax Regs., retroactively. In *79 Central Illinois Public Serv. Co., the Supreme Court reversed the Seventh Circuit's judgment that reimbursed lunch expenses of employees who were on company travel constituted "wages" subject to withholding within the meaning and requirements of sections 3401-3403.Although noting that an imposition of withholding responsibility for lunch reimbursements was "somewhat retroactive in character," the Court then stated that it did not "decide today whether a new regulation that, for withholding purposes, would require the treatment of lunch reimbursements as wages under the existing statute would or would not be valid." 435 U.S. at 32 n.12. A fortiori, Central Illinois Public Serv. Co. should not be read to cast doubt upon a regulation promulgated, as here, in an entirely different context. To reflect the foregoing and prior concessions, Decision will be entered under Rule 155.
Footnotes
*. By order dated August 28, 1985, the Chief Judge reassigned this case from Judge Herbert L. Chabot to Judge Arthur L. Nims, III↩, for disposition.
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect for the years in question. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. For purposes of determining personal holding company tax, respondent reduced the $1,396,115.09 received by petitioner by $298,092.65 to reflect a duplication of reporting in previous years. ↩
3. For 1962, section 543 provided in relevant part: SEC. 543. PERSONAL HOLDING COMPANY INCOME. (a) General Rule.--For purposes of this subtitle, the term "personal holding company income" means the portion of the gross income which consists of: * * * (2) Stocks and Securities Tfransactions.--Except in the case of regular dealers in stock or securities, gains from the sale or exchange of stock or securities.
4. We nevertheless note that it is far from clear whether the Court conclusively determined the claims' date of distribution value in Foster v. Commissioner,T.C. Memo. 1966-273, modified and remanded on a different issue sub nom. Likins-Foster Honolulu Corp. v. Commissioner,417 F.2d 285↩ (10th Cir. 1969).
5. The record contains no evidence establishing the actual date on which Biggs and El Paso distributed the claims to LFH. The parties agree, however, that all assets of the Wherry corporations, including the claim of each corporation against the United States, had been distributed to their shareholders by August 8, 1959.