840 F.2d 642
 61 A.F.T.R.2d 88-660, 88-1 USTC P 9187
 LIKINS-FOSTER HONOLULU CORP.; Aliamanu Homes, Ltd.;
Likins-Foster Topeka Corp.; Likins-Foster Salinas
Corp.; Limita Homes, Inc.; Cardiff
Homes, Inc., etc., et al.,
Petitioners-Appellants,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellee.
 No. 87-7001.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 9, 1987.
Decided Feb. 17, 1988.
 
 Valentine Brookes and Lawrence V. Brookes, Brookes & Brookes, San Francisco, Cal., for petitioners-appellants.
 Michael L. Paup, Jonathan S. Cohen and Kenneth L. Greene, Tax Div., U.S. Dept. of Justice, Washington, D.C., for respondent-appellee.
 Appeal from a Decision of the Tax Court of the United States.
 Before GOODWIN and FLETCHER, Circuit Judges, and KING,* District Judge.
 GOODWIN, Circuit Judge:
 
 
 1
 Taxpayers appeal from a decision of the United States Tax Court, 50 T.C.M. (CCH) 1465 (1985), upholding the Commissioner's allocation, under I.R.C. Sec. 482 (1984), of interest income to Likins-Foster, parent corporation, as a result of interest-free loans made by it to its subsidiary. We affirm.
 
 
 2
 Likins-Foster Honolulu Corporation, a cash basis taxpayer, is the common parent of an affiliated group of corporations that filed consolidated returns for the tax years ending June 30, 1961, and June 30, 1963 through June 30, 1967.
 
 
 3
 During its 1963, 1964, 1965, and 1967 fiscal years, Taxpayer made interest-free loans to Roy Turner & Associates, Ltd. (Turner), a member of the consolidated group. In his deficiency notice, the Commissioner of the Internal Revenue Service (Commissioner), pursuant to I.R.C. Sec. 482 (1984), allocated the below amounts as interest income from Turner to Taxpayer:
 
 
 4
 Year Amount
June 30, 1963 $ 64,366.80
June 30, 1964 128,182.92
June 30, 1965 128,472.41
June 30, 1967 9,669.17
 
 
 5
 The Commissioner determined that the amounts so allocated constituted personal holding company income within the meaning of I.R.C. Sec. 543(a)(1) (1984). Taxpayer urged that the amount allocated to it as interest should not be included in its gross income.
 
 
 6
 Prior to February 11, 1958, Taxpayer filed consolidated returns with Likins-Foster Ord Corp. (Ord), Likins-Foster Monterey Corp. (Monterey), Likins-Foster Biggs Corp. (Biggs), and Likins-Foster El Paso Corp. (El Paso), collectively referred to as the "Wherry corporations." From and after February 10, 1958, Taxpayer owned 79 1/3 percent of the stock of the Wherry corporations. Because Taxpayer ceased to own 80 percent of the stock of the Wherry corporations as of February 10, 1958, the Wherry corporations became ineligible to file consolidated returns with Taxpayer as of that date.
 
 
 7
 In 1950, Biggs and El Paso entered into agreements with the Secretary of the Air Force pursuant to the provisions of the Wherry Act for the lease of land and the construction of 400 houses each at Biggs Air Force Base. Ord and Monterey entered into similar agreements with the Secretary of the Army in 1951 and 1952, respectively, for the construction of 500 houses each at Fort Ord Military Reservation.
 
 
 8
 In 1957, the United States filed a complaint in condemnation and declaration of taking against Biggs and El Paso in a Texas district court, and deposited with that court estimated just compensation. The United States also filed a similar complaint and declaration of taking against Ord and Monterey in the United States District Court for the Northern District of California. At that time the United States deposited amounts with the court as estimated just compensation for Monterey and Ord.
 
 
 9
 On the dates the complaints were filed, each district court entered judgment awarding title to the condemned properties to the United States, but continuing the proceedings to determine and award just compensation to the Wherry corporations. Thereafter, each Wherry corporation filed an appearance stating that it had no objection to the taking, but that it demanded a jury trial with respect to the determination of just compensation. The consolidated group did not report any income from the condemnations on their federal income tax return filed for the fiscal year ending June 30, 1958.
 
 
 10
 On August 19, 1958, Ord and Monterey filed motions for withdrawal of the funds deposited by the United States in the district court in California. Biggs and El Paso filed similar motions the next day in district court in Texas.
 
 
 11
 On August 21, 1958, the district court in California entered an order for the payment to Ord and Monterey. Those payments were withdrawn pursuant to the order on August 27, 1958, and deposited in Taxpayer's bank account. Similarly, on August 25, 1958, the district court in Texas entered an order for payment to Biggs and El Paso. These payments were withdrawn pursuant to the order on September 2, 1958, and were deposited in Taxpayer's bank account. On September 5, 1958, Taxpayer entered on its book a credit of $888,576.13 to "Gain on Sale of Assets," which represented its share of the total amounts withdrawn from the courts.
 
 
 12
 On August 11, 1958, each of the Wherry corporations adopted liquidation plans which they reported on their separate federal income tax returns for the fiscal year ending June 30, 1959. Each corporation reported that its principal asset was a group of leasehold improvements which were the subject of ongoing condemnation proceedings. The corporations reported that they had received amounts in partial compensation for the condemned properties but that, because the condemnation proceedings were not yet completed, they could not determine the amount of gain realized as a result of the condemnations. The corporations stated that, in any event, pursuant to I.R.C. Sec. 337 (1984), they were not subject to tax on any realized gain. By August 8, 1959, all assets of the Wherry corporations, including the claim of each corporation against the United States in connection with the condemnation proceedings, had been distributed to their shareholders. In their federal income tax return for their fiscal year ending June 30, 1960, Taxpayer and its subsidiaries did not assign a value to the claims when reporting their gain from the liquidations.
 
 
 13
 A judgment rendered by jury verdict was entered by the district court in California in favor of Ord and Monterey on June 23, 1960. A consolidated order of payment in the amount of $1,194,181.94, plus interest on part of that amount, was entered in favor of Ord and Monterey on June 29, 1960. Since the United States had previously paid $782,053 to Ord and Monterey, the court ordered payment to those corporations of $467,813.14. Ord and Monterey appealed the judgment of the district court to this court, which affirmed the judgment of the district court on October 1, 1962.
 
 
 14
 The district court in Texas entered a judgment pursuant to a jury verdict in the amount of $1,700,000 in favor of the former shareholders of Biggs and El Paso on August 7, 1962. The former shareholders of Biggs and El Paso had been made parties to the condemnation proceedings after liquidation of the corporations under the plan of liquidation adopted on August 11, 1958. Pursuant to this order, the United States deposited $1,765,920.57 with the district court on August 15, 1962, and the former shareholders of Biggs and El Paso withdrew that amount on August 29, 1962.
 
 
 15
 On its consolidated return for its fiscal year ending June 30, 1963, Taxpayer and its subsidiaries reported that they had realized capital gain in the amount of $1,396,115.09 as their share of the final condemnation award payment received with respect to Biggs and El Paso on August 29, 1962. The Commissioner determined that $1,098,022.94 of this final condemnation payment received by Taxpayer constituted a liquidating dividend, and therefore was personal holding company income pursuant to I.R.C. Sec. 543 (1984).
 
 Prior Tax Court Proceedings
 
 16
 Taxpayer, its subsidiaries, and the Wherry corporations reported no gain on the condemnation of the properties on their federal income tax returns for their fiscal year ending June 30, 1959. Instead, Taxpayer and its subsidiaries reported capital gain in the amount of $891,225.56 from "gain on condemnation of Wherry corporations" on their federal income tax return for their fiscal year ended June 30, 1960. The Commissioner determined that Taxpayer received $888,576.13 (its share of the total amount withdrawn from the district courts) from the Wherry corporations as a distribution in liquidation during its fiscal year ended June 30, 1959, and that Taxpayer's adjusted basis in the stock of these corporations was zero. Accordingly, the Commissioner determined that the entire $888,576.13 was capital gain to the Taxpayer. The Commissioner did not contend that Taxpayer was then subject to tax on the distributed claims. The Commissioner also determined that each Wherry corporation realized a gain upon the withdrawal of the amounts deposited with the court by the government, and that Taxpayer and the other shareholders in the Wherry corporations were liable as transferees for the tax on those gains. The Commissioner further determined that I.R.C. Sec. 337 (1984) did not apply, and that each Wherry corporation was subject to tax on the gain it realized. Taxpayer petitioned the Tax Court for a redetermination of the deficiency asserted by the Commissioner.
 
 
 17
 The Tax Court held that I.R.C. Sec. 337 (1984) did not apply to the gain realized by the Wherry corporations as a result of the condemnations. The court held that the former shareholders of the Wherry corporations, including Taxpayer, were liable as transferees for the tax owed by the Wherry corporations as a result of the condemnations. The court found, as an ultimate fact, that the transferees' liability extended to the amounts withdrawn plus the fair market value of the claims of the Wherry corporations against the United States. The court then stated that the government had not demonstrated that the value of such claims was in excess of the amount determined by the district court to be payable for "mortgage insurance and escrowed funds and personal property of Ord and Monterey." The Tax Court also held that the distribution in the amount of $888,576.13 to Taxpayer in its fiscal year ending June 30, 1959, was a distribution in liquidation, taxable as capital gain, and that Taxpayer had a zero basis in the stock of the Wherry corporations. Taxpayer argued that amounts withdrawn were subject to liabilities. The court determined that at the time of the liquidations "the claims against the United States were not shown to have been distributed and that Taxpayer had not shown that such claims would not be of sufficient value to discharge any liabilities that the Wherry corporations had."
 
 Tax Court Proceedings
 
 18
 In the instant proceedings, the Tax Court held that the interest allocated to taxpayer pursuant to I.R.C. Sec. 482 (1984), and the amounts received in 1962 as a result of the Biggs and El Paso condemnation litigation, constituted personal holding company income. The court further held that treating amounts allocated to taxpayer as interest under I.R.C. Sec. 482 (1984) as personal holding company income was consistent with the policy behind both I.R.C. Sec. 482 (1984) and the personal holding company tax, and that the retroactive application of Treas.Reg. Secs. 1.482-1 and 1.482-2 was not an abuse of discretion. With respect to the character of the final condemnation payment, the court refused to consider Taxpayer's contentions regarding collateral estoppel because they had not been raised in any pleadings. Finally, the court further held that on the basis of record evidence, Taxpayer had failed to prove that the claims had an ascertainable fair market value on the date of distribution.
 
 
 19
 In his deficiency notice, the Commissioner, pursuant to I.R.C. Sec. 482 (1984) and certain Treasury Regulations adopted thereunder, 26 C.F.R. Secs. 1.482-1 and 1.482-2, allocated interest income to Taxpayer as a result of interest-free loans made to its wholly-owned subsidiary, Turner, during the taxable years 1963, 1964, 1965 and 1967. Taxpayer does not contest the amounts allocated, but does contend that the Commissioner erroneously determined that these allocated amounts constitute interest income.
 
 I.R.C. Sec. 482 (1984) provides:
 
 20
 In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.
 
 
 21
 Specifically, Treas.Reg. Sec. 1.482-2(a)(1) allows the Commissioner to make an allocation to properly reflect an arm's length charge for interest on loans from one member of a controlled group to another. The Commissioner has the authority to allocate whether or not the borrower realizes income from the loan. Treas.Reg. Sec. 1.482-1(d)(4).
 
 
 22
 Schemes permitting related entities, such as Taxpayer and its subsidiary, to manipulate their tax obligations by transfer of monies between themselves merit careful scrutiny. Kerry Inv. Co. v. Commissioner, 500 F.2d 108, 109 (9th Cir.1974). The Tax Court in Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199, 212 (1977), aff'd per curiam, 618 F.2d 100 (4th Cir.1980), stated the following when applying these particular regulations:
 
 
 23
 An obvious method which can be used to milk one commonly controlled organization for the benefit of another is the making of interest free loans. Under this method, the lending entity, by not reporting interest on the loans, has lower earnings and, consequently, lower taxes. By not paying interest, the borrowing entity, if it has no net taxable income, merely eliminates a deduction which otherwise would increase its losses. As a group the commonly controlled organizations pay less income tax than they would if they had dealt at arm's length and charged interest on the loans.
 
 
 24
 Further, the Eighth Circuit in Kahler Corp. v. Commissioner, 486 F.2d 1, 5 (1973), was the first to formulate a test to determine the validity of such schemes: to survive such scrutiny, Taxpayer must demonstrate that "the loans from [Taxpayer] to other members of a controlled group [Turner] would have been made on an interest free basis in arm's length dealings between uncontrolled taxpayers." Kahler involved a situation where the parent corporation loaned, on an interest-free basis, a portion of money it borrowed at an interest rate exceeding 5 percent to its subsidiaries. Id. at 2. This scheme afforded Kahler a tax benefit. Kahler's income would have increased had it charged interest on the loans to its subsidiaries; this income would have been taxed at a rate of 48 percent. Had the subsidiaries paid interest to Kahler, they would have had to deduct at a lesser rate of 22 percent. Taxpayer was thus able to avoid paying its true tax obligation. The Kahler court concluded that this particular scheme was precisely the situation I.R.C. Sec. 482 (1984) was designed to prevent. Id. at 5.
 
 
 25
 Moreover, unrelated parties dealing at arm's length would not customarily loan large sums without interest. B. Forman Co. v. Commissioner, 453 F.2d 1144, 1156 (2d Cir.), cert. denied, 407 U.S. 934, 92 S.Ct. 2458, 32 L.Ed.2d 817 (1972). Forman involved two independent corporations, taxpayers, who had created a jointly owned subsidiary to develop a shopping center. Id. at 1147-49. Each corporation loaned a subsidiary $1,000,000 and in exchange received notes which bore an interest rate of 3 1/2 percent. Eventually these notes were exchanged for noninterest bearing notes. The Commissioner allocated interest income at a rate of 5 percent per annum on the outstanding indebtedness to each corporation. Id. at 1147. The Forman court concluded that the interest-free loans were not at arm's length, as no unrelated parties would loan such large sums without interest, and found that the Commissioner's allocation was necessary to reflect their proper taxable incomes. Id. at 1156.
 
 
 26
 When presented with this issue, we adopted reasoning similar to the Kahler and Forman courts in Kerry, 500 F.2d 108. Similar to Taxpayer here, the taxpayer in Kerry made interest-free loans to its wholly-owned subsidiary. We determined there that the taxpayer's true taxable income was not reflected because, in making loans on an interest-free basis, it had divested itself of interest income it could have earned by making an interest-bearing loan. Id. at 109. As a consequence of not reporting interest on the note, the Taxpayer was also able to report lower earnings and thus lower its tax liabilities. Such a scheme does not reflect true taxable income. Treas.Reg. Sec. 1.482-1(a)(6). Our opinion in Kerry is in harmony with the decisions of the Second, Fifth and Eighth Circuits in cases in which this precise question has been presented. We therefore hold that Taxpayer's loans on an interest-free basis to its wholly-owned subsidiary, Turner, create interest income within the meaning of I.R.C. Sec. 482 (1984).
 
 
 27
 Taxpayer contends that the Commissioner abused his discretion to make allocations when he retroactively applied Treas.Reg. Secs. 1.482-1 and 1.482-2 to cover transactions conducted prior to their promulgation. Taxpayer therefore urges that the Commissioner be estopped from applying the disputed regulation retroactively.
 
 
 28
 A presumption that regulations will be retroactively applied unless otherwise specified is established by I.R.C. Sec. 7805(b) (1984):
 
 
 29
 The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.
 
 
 30
 Thus, I.R.C. Sec. 7805(b) (1984) gives the Commissioner broad discretion in delimiting the extent, if any, to which a regulation will be retroactively applied. Dixon v. United States, 381 U.S. 68, 71, 85 S.Ct. 1301, 1303, 14 L.Ed.2d 223 (1965); Manocchio v. Commissioner, 710 F.2d 1400, 1403 (9th Cir.1983); Kahler Corporation v. Commissioner, 486 F.2d at 5. The Commissioner's broad discretion under I.R.C. Sec. 7805(b) (1984) is limited only by a finding of abuse. Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 183, 77 S.Ct. 707, 1 L.Ed.2d 746 (1957) (interpreting the predecessor to Sec. 7805(b) of the 1954 Code). Abuse may be found where a regulation retroactively applied produces a result that is unduly harsh to an individual taxpayer. Redhouse v. Commissioner, 728 F.2d 1249, 1252 (9th Cir.) (affirming retroactive application of Treas.Reg. Sec. 1.612-3(b)(3), where the taxpayer had notice from an IRS news release that the contested item might have not been deductible), cert denied, 469 U.S. 1034, 105 S.Ct. 506, 83 L.Ed.2d 397 (1984). Reliance on settled law or on a specific, favorable ruling constitutes evidence of a harsh result. Id.
 
 
 31
 More specifically, the Eighth Circuit in Kahler, 486 F.2d at 5, considered the validity of retroactive application of Treas.Reg. Secs. 1.482-1 and 1.482-2 and concluded that the Commissioner had not abused his discretion.
 
 
 32
 We adopted the Kahler reasoning in Kerry, 500 F.2d at 108. We considered the taxpayer's argument meritless and found no abuse of discretion. Id. at 109 n. 2. The taxpayer in Kerry is not distinguishable from Taxpayer here. Kerry is directly on point and therefore is appropriately controlling.
 
 
 33
 Taxpayer next contends that the authority of Kerry on the issue of retroactive application of Treas.Reg. Secs. 1.482-1 and 1.482-2 is eclipsed by the Supreme Court decision, Central Illinois Public Serv. Co. v. United States,[1] 435 U.S. 21, 98 S.Ct. 917, 55 L.Ed.2d 82 (1978), which was rendered after we decided Kerry. For this contention Taxpayer cites the following dictum:
 
 
 34
 An imposition of withholding responsibility on the Company for the lunch reimbursement as far back as 1963 strikes us as somewhat retroactive in character and almost punitive in the light of the facts of this case.
 
 
 35
 Id. at 32 n. 12, 98 S.Ct. at 923 n. 12. Notwithstanding Taxpayer's contention, the majority reserved consideration as to the validity of the regulation:
 
 
 36
 Needless to say, we do not decide today whether a new regulation that, for withholding purposes, would require the treatment of lunch reimbursement as wages under the existing statute would or would not be valid.
 
 
 37
 Id. Consequently, Central Illinois Public Serv. Co. does not undermine the binding authority of Kerry. We accordingly hold that since the Commissioner has not abused his discretion in retroactively applying I.R.C. Sec. 482 (1984), he is not estopped from imputing interest income as a result of Taxpayer's interest-free loans to its subsidiary, Turner.
 
 
 38
 Taxpayer contends that interest allocated to it under I.R.C. Sec. 482 (1984) does not constitute personal holding company income within the purview of I.R.C. Sec. 543(a)(1) (1984).[2] Taxpayer specifically argues that the purpose of personal holding company provisions--to compel personal holding companies to distribute dividends--is frustrated when interest income is imputed under I.R.C. Sec. 482 (1984). Taxpayer contends that income imputed under I.R.C. Sec. 482 (1984) yields no actual income or dividends from which the corporation can distribute. Taxpayer therefore asserts that I.R.C. Sec. 543 (1984) interest must be actually received and that allocated interest lacks this character and therefore falls outside the scope of I.R.C. Sec. 543(a)(1) (1984) income. In presenting such a simplistic argument, Taxpayer relies on Treas.Reg. Sec. 1.543-1(b)(2) which states:
 
 
 39
 The term "interest" means any amounts, includible in gross income, received for the use of money loaned.
 
 
 40
 (emphasis added). Taxpayer also relies on cases which hold that before income can be allocated to a borrower under I.R.C. Sec. 482 (1984), income must exist.[3] These cases apply a "tracing" theory which requires the Taxpayer to demonstrate that the proceeds of the interest-free loan did not produce gross income or was not used in the production of income. In Kerry, we expressly rejected the tracing theory: "we hold that tracing in order to determine whether the borrowed funds generated gross income to the borrower is neither necessary nor required." Kerry, 500 F.2d at 110. In so holding we relied on Kahler, which noted:
 
 
 41
 We find no support in the legislative history of Section 482 for the claim that transactions between controlled corporations must be traced to the production of gross income. The express purpose of that statute is the prevention of tax evasion....
 
 
 42
 486 F.2d at 5 n. 7 (citations omitted); See Fitzgerald Motor Co. v. Commissioner, 508 F.2d 1096, 1101 (5th Cir.1975) (interest income allocated on interest-free loans made among three sister corporations controlled by the same individual).
 
 
 43
 In addition, the plain language of Treas.Reg. Sec. 1.543-1(b)(2) does not demand such a narrow reading. The regulation includes no restricting language as conveyed by the use of an adverb such as "actually." More important, personal holding company provisions are designed to levy tax automatically on any corporation falling within its ambit. H.R.Rep. No. 704, 73d Cong., 2d Sess. 13, 15 (1934); Hilldun Corp. v. Commissioner, 408 F.2d 1117, 1122 (2d Cir.1969). The Second Circuit noted:
 
 
 44
 Moreover, the legislative history shows that while the tax is aimed primarily at the "incorporated pocketbook," it is to be levied upon any corporation falling within the statutory provisions.
 
 
 45
 Id. at 1122 (emphasis added). The Tax Court in Lake Gerar Development Co. v. Commissioner, 71 T.C. 887 (1979), determined, in fact, that "interest" as included in I.R.C. Sec. 543(a)(1) (1984) is as broad as "interest" as employed in I.R.C. Sec. 61 (1984):
 
 
 46
 It also seems clear that the term "ordinary gross income" as defined in section 543(b)(1) is based upon the concept of "gross income" as defined in section 61. Thus, we believe that for purposes of "ordinary gross income," "interest" must have the same meaning as "interest for purposes of section 61.... From this it follows that section 543(a)(1) which defines "personal holding company income" as "the portion of the adjusted ordinary gross income which consists of ... interest" also includes interest as defined in section 61, except for certain adjustments.
 
 
 47
 71 T.C. at 894.
 
 
 48
 Moreover, the Tax Court in Krueger Co. v. Commissioner, 79 T.C. 65 (1982), considered this precise issue, whether the interest allocated to Krueger Company pursuant to I.R.C. Sec. 482 (1984) constituted personal holding company income for I.R.C. Sec. 543 (1984) purposes. Krueger involved interest-free loans made between corporations controlled by common interests. The Krueger court concluded that the allocated interest "must also be considered interest for purposes of the personal holding company provisions." 79 T.C. at 71.[4] As Krueger is directly on point, we adopt the Tax Court's reasoning there. Thus, Taxpayer's argument on this issue fails.
 
 
 49
 The Commissioner argues that since the claims for just compensation received by Taxpayer in the liquidation of Biggs and El Paso had no ascertainable fair market value (FMV) on the date of the distribution, the transaction remained open for purposes of determining Taxpayer's gain on the liquidation. The Commissioner therefore argues that the subsequent payments made on the claims ought to be treated as gains received in exchange for the liquidated corporate stock. Alternatively, the Commissioner argues that if it is determined that the payment at issue does not constitute personal holding company income, then the payment received on the claim would be ordinary income instead of capital gain.
 
 
 50
 On the other hand, Taxpayer contends that the Commissioner was erroneous in his determination that the condemnation payment had no ascertainable FMV at distribution. Taxpayer further urges that the subsequent condemnation payment received on its claim against the government was not in exchange for its stock but was payment on an indebtedness within the meaning of section 1232. Consequently, Taxpayer argues that it realized capital gain upon receipt of the payment.
 
 
 51
 It is well settled that liquidating dividends, for the purposes of the personal holding companies' provisions, are characterized as gains received from the sale or exchange of stock. Helvering v. Syndicated Varieties, 140 F.2d 344, 346-47 (D.C.Cir.1944); Lansing Broadcasting Co. v. Commissioner, 52 T.C. 299, 302 (1969), aff'd, 427 F.2d 1014 (6th Cir.) cert denied, 400 U.S. 941, 91 S.Ct. 238, 27 L.Ed.2d 244 (1970). Additionally, when subsequent payments realized upon an asset which has no FMV are received in corporate liquidation, the transaction remains open. Burnet v. Logan, 283 U.S. 404, 409, 51 S.Ct. 550, 551, 75 L.Ed. 1143 (1931). Doering v. Commissioner, 39 T.C. 647, 649 (1963); Westover v. Smith, 173 F.2d 90, 91 (9th Cir.1949). Payments received on such open transactions are treated as liquidating dividends or rather as gains received in exchange of stock or securities, and thus constitute personal holding company income. Therefore, the dispositive question is whether the condemnation claims had ascertainable FMVs when distributed to Taxpayer in 1959.
 
 
 52
 Only in rare and extraordinary circumstances will property received upon liquidation of a corporation be considered as insusceptible of valuation. Slater v. Commissioner,[5] 356 F.2d 668, 670 (10th Cir.1966) (interpreting Treas.Reg. Sec. 1.1001-11). Whether the distributed asset is insusceptible of FMV determination is a question of fact. Id. Moreover, Taxpayer has the burden of proving that Biggs and El Paso's claim against the government was susceptible of valuation at the time of the liquidating distribution. Id. at 670.
 
 
 53
 In In re Steen, 509 F.2d 1398 (9th Cir.1975), we held that a right to a payment which was wholly contingent upon a favorable judicial determination on a novel question of state law had no ascertainable FMV. In so finding, we determined that the transaction was open for tax purposes and that the subsequent contingency payment would be treated as capital gain. Id. at 1403-04. The record reveals that the claims involved here are similarly contingent.
 
 
 54
 Before liquidation, Biggs and El Paso had requested a jury trial to ascertain the amount of just compensation for the condemned assets. The final determination of this issue did not occur until August 7, 1962, when the district court in Texas entered a judgment pursuant to the jury verdict approximately three years after the claims had been distributed in liquidation. Taxpayer presents no evidence suggesting that the amount of just compensation, if any, which the jury might have awarded to Biggs and El Paso in the condemnation proceedings was ascertainable prior to the tender of the jury's verdict. To the contrary, the record contains strong evidence that Taxpayer considered the value of the claims unascertainable at the time of the distribution. On their separate returns for fiscal year ending June 30, 1959, the Wherry corporations reported that they could not yet determine the amount of gain realized on the condemnation of their property. Further, Taxpayer did not assign a value to the claims when reporting its gain from the liquidation on its tax return for fiscal year ending June 30, 1960. These facts belie Taxpayer's contentions; Taxpayer, therefore, has failed to satisfy its burden of proving that the value of the claims was ascertainable on the date of distribution. Hence, we draw the conclusion that Taxpayer received the final condemnation award payment in exchange for stock and that such payment constitutes personal holding company income within the meaning of I.R.C. Sec. 543 (1984).
 
 
 55
 AFFIRMED.
 
 
 
 *
 Honorable Samuel P. King, United States District Judge, District of Hawaii, sitting by designation
 
 
 [1]
 The majority concluded that employee lunch expense reimbursements did not constitute "wages" subject to withholding under I.R.C. Sec. 3401(a)
 
 
 [2]
 "[P]ersonal holding company income means the portion of the adjusted ordinary gross income which consists of ... [d]ividends, interest, royalties, ..., and annuities." I.R.C. Sec. 543(a)(1) (1982) (emphasis added)
 
 
 [3]
 See, e.g., Tennessee-Arkansas Gravel Co. v. Commissioner, 112 F.2d 508 (6th Cir.1940); Combs Lumber Co. v. Commissioner, 41 B.T.A. 339 (1940), acq., 1940-1 C.B. 2; Smith-Bridgman & Co. v. Commissioner, 16 T.C. 287 (1951), acq., 1951-1 C.B. 3; Society Brand Clothes, Inc. v. Commissioner, 18 T.C. 304 (1952), acq., 1952-2 C.B. 3; Atchison, Topeka & Sante Fe Railroad Co. v. Commissioner, 36 T.C. 584 (1961), acq., 1962-1 C.B. 3; PPG Industries, Inc. v. Commissioner, 55 T.C. 928 (1970); Huber Homes, Inc. v. Commissioner, 55 T.C. 598 (1971)
 
 
 [4]
 An analogy can be made to unpaid interest included in income by an accrual basis corporation; however, such interest may constitute personal holding company income. See Joseph Lupowitz Sons, Inc. v. Commissioner, T.C. Memo 1972-238, rev'd in part on other grounds, aff'd in part, and remanded in part, 497 F.2d 862 (3d Cir.1974). In that case, the Tax Court there held that interest received on a purchase money mortgage is interest for personal holding company purposes
 
 
 [5]
 Taxpayer's interest in a patent agreement distributed upon a complete liquidation had an ascertainable FMV and the transaction therefore was a closed one for tax purposes